PAUL AFRED BROWN,

     Petitioner,

v.                            Case No.  8:01-cv-2374-T-23TGW

SECRETARY, DEPT. OF
CORRECTIONS,

     Respondent.

_____/

## ORDER

     Paul Alfred Brown, a Florida prisoner under sentence of death, petitions for

the writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Brown proceeds on his

timely amended petition (Doc. 59) (the "petition").  Because Brown was tried and

sentenced in Hillsborough County, Florida, venue properly lies in the Middle District

of Florida.

## PROCEDURAL AND FACTUAL BACKGROUND

     Paul Alfred Brown was convicted of the first-degree murder of Pauline Cowell,

an armed burglary, and the attempted murder of Tammy Bird. The Florida supreme

court affirmed the judgment and sentence of death in Brown v. State, 565 So. 2d

304 (Fla.), cert. denied, 498 U.S. 992 (1990), which includes the pertinent facts of

the murder:

>      Around 1:30 a.m., March 20, 1986 two gunshots woke Barry and
> Gail Barlow.  Upon entering the Florida room of their home they found
> Gail's seventeen-year-old sister, Pauline Cowell, dead in her bed.
> Pauline's friend, Tammy Bird, had also been shot, but was still alive.
> The room's outside door stood open, missing the padlock with which it
> had been secured.  Pursuant to information indicating Brown might be

a suspect, sheriff's deputies began searching for him in places he was known to frequent and found him hiding behind a shed in a trailer park where Brown's brother lived. They arrested Brown and seized a handgun, later linked to the shootings,[FN2] from his pants pocket.

> [FN2] Tests showed that bullets found at the murder scene had been fired from the handgun seized from Brown.

> Brown lived with the murder victim's mother, and the victim had only recently moved into her sister's home. Brown confessed after being arrested and, at the sheriff's office, stated that he had broken into the victim's room to talk with her about some "lies" she had been telling. Although he entered the room armed, Brown claimed that he had not intended to kill the girl, but that he planned to shoot her if she started "hollering."

> The jury convicted Brown of armed burglary, first-degree murder, and attempted first-degree murder and recommended the death sentence. The trial court found that the mitigating evidence did not outweigh the aggravating circumstances and sentenced Brown to death.

Brown, 565 So. 2d at 305.

The Florida supreme court also states:

> Turning to the sentencing portion of Brown's trial, the trial court found that three aggravating circumstances had been established, i.e., committed during commission of a felony, previous conviction of a violent felony, and committed in a cold, calculated, and premeditated manner. The court found several items of evidence in mitigation (mental capacity, mental and emotional distress, social and economic disadvantage, nonviolent criminal past), but considered them of so little weight as not to outweigh even any one of the aggravating factors.

565 So. 2d at 308.

The United States Supreme Court denied Brown's petition for the writ of

certiorari. Brown v. Florida, 498 U.S. 992 (1990). Brown filed a Rule 3.850 motion

for post-conviction relief and two amended Rule 3.850 motions in the state court.

He proceeded on his 1996 third amended Rule 3.850 motion in which he raised

sixteen claims. A list of the claims appears at Appendix B to the response. (Doc. 66) The post-conviction court granted an evidentiary hearing on grounds 3, 6, 7, and 8 and summarily denied relief on the remaining claims. (Exhibit Q1, pp. 298-355) After the evidentiary hearing (Exhibit Q4-Q8, pp. 1-502), the post-conviction court denied the remaining grounds in Brown's third amended Rule 3.850 motion. (Exhibit Q3, pp. 449-53) Brown appealed that adverse ruling to the Florida supreme court and argued fourteen issues. (See Exhibit C to Doc. 66) The Florida supreme court affirmed the post-conviction court's rejection of Brown's claims and denied rehearing. Brown v. State, 755 So. 2d 616 (Fla. 2000).

Seeking state habeas corpus relief in the Florida supreme court, Brown raised two issues. The Florida supreme court denied both claims and found (1) that Brown's claim of incompetence to be executed was premature and not ripe for review and (2) that Brown's claim that the death sentence is unconstitutional and that appellate counsel was ineffective, based on Apprendi v. New Jersey, 530 U.S. 466 (2000), had no merit. Brown v. Moore, 800 So. 2d 223 (Fla. 2001). (See Appendix D to Doc. 66)

Brown filed a successive Rule 3.851 motion to vacate sentence, in which he challenged the unconstitutionality of Section 921.137, Florida Statutes, which states:

> A sentence of death may not be imposed upon a defendant convicted of a capital felony if it is determined in accordance with this section that the defendant has mental retardation.

Brown objected to provision eight of the statute, which states: "This section does not apply to a defendant who was sentenced to death prior to the effective

date of this act." The effective date of the statute is June 12, 2001, and Brown was sentenced in 1987. (Exhibit AA-1, pp. 17-77) The State filed its Response. (Exhibit AA-1, pp. 78-163) The post-conviction court conducted an evidentiary hearing at which Dr. Valerie McClain and Dr. Greg Prichard testified regarding whether Brown met the standard for mental retardation under Section 912.137. (Exhibit AA-6, pp. 843-911 and 913-68) Both the defense and the State submitted written final arguments. (Exhibits AA-1, pp. 169-209 and AA-3, pp. 376-517, respectively) The court appointed Dr. Michael Maher to examine Brown and held another evidentiary hearing at which Dr. Maher testified. (Exhibit AA-6, pp. 981-1039) This latter evidentiary hearing was continued until a month later at which time Dr. Maher concluded his testimony and Dr. McClain testified again. (Exhibit AA-7, pp. 1044-1120) Both the State and Brown simultaneously filed a final argument from the trifurcated evidentiary hearing on mental retardation. (Exhibits AA-3, pp. 376-83 and AA-5, pp. 717-77, respectively) The post-conviction court denied Brown's successive Rule 3.851 motion. (Exhibit AA-5, pp. 778-82) Brown appealed and the Florida supreme court affirmed the denial of relief. Brown v. State, 959 So. 2d 146 (Fla. 2007).

Filing yet another successive Rule 3.851 motion to vacate, Brown challenged the state's lethal injection protocol. The post-conviction court dismissed the successive motion without prejudice to Brown's re-filing the motion within sixty days. Brown re-filed his successive motion to vacate, which he amended claiming that his sentence of death is unconstitutional because Florida's method of execution by lethal injection violates the Eighth Amendment prohibition against "cruel and

unusual punishment."  The court denied the successive Rule 3.851 motion and

Brown appealed.  The Florida supreme court affirmed the post-conviction court's

denial of relief.

This federal case, commenced in December, 2001, was stayed six months

later and not re-opened until September, 2007.  A month later, Brown filed the

present amended 28 U.S.C. § 2254 petition for the writ of habeas corpus raising

nine grounds for relief.  At the same time Brown filed the latter Rule 3.851 motion to

vacate challenging the State's lethal injection protocol, a proceeding that concluded

a few months ago.

### THE GOVERNING LEGAL PRINCIPLES

Because Brown filed his petition after April 24, 1996, this case is governed by

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA").  Penry v. Johnson, 532 U.S. 782, 792 (2001); Henderson v.

Campbell, 353 F.3d 880, 889-90 (11th Cir. 2003).  The AEDPA "establishes a more

deferential standard of review of state habeas judgments," Fugate v. Head, 261

F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to

ensure that state court convictions are given effect to the extent possible under

law."  Bell v. Cone, 535 U.S. 685, 693 (2002); see also Woodford v. Visciotti, 537

U.S. 19, 24 (2002) (recognizing a highly deferential standard for a federal habeas

evaluation of a state court ruling).

### A. Standard of Review Under the AEDPA

The AEDPA precludes habeas relief from an adjudication on the merits in

state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider."  Maharaj v. Secretary for Dep't of Corr., 432 F.3d 1292, 1308 (11th Cir. 2005), cert. denied, 549 U.S. 819 (2006).  The meaning of the clauses was discussed in Parker v. Head, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." Parker, 244 F.3d at 835.

Finally, under Section 2254(d)(2), a federal court may grant the writ of habeas corpus if the state court's decision "was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding."  A

determination of fact by a state court enjoys a presumption of correctness, and a

habeas petitioner bears the burden of rebutting the presumption of correctness by

clear and convincing evidence.  See Parker, 244 F.3d at 835-36; 28 U.S.C.

§ 2254(e) (1).

Exhaustion of State Court Remedies and Procedural Default

Federal review by a motion under Section 2254 remains unavailable until a

petitioner "has exhausted the remedies available in the courts of the State . . . ."  28

U.S.C. 2254(b)(1)(A); Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998).

"In other words, the state prisoner must give the state courts an opportunity to act

on his claims before he presents those claims to a federal court in a habeas

petition."  O'Sullivan v. Boerckel, 526 U.S. 838,  842 (1999).  See also Henderson,

353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a

federal constitutional claim in federal court unless he first properly raised the issue

in the state courts.") (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001));

Snowden v. Singletary, 135 F.3d at 735 ("Exhaustion of state remedies requires

that the state prisoner fairly presen[t] federal claims to the state courts in order to

give the State the opportunity to pass upon and correct alleged violations of its

prisoners' federal rights.") (quoting Duncan v. Henry, 513 U.S. 364, 365 (1995)).

Exhaustion of state court remedies generally requires a petitioner to pursue

discretionary appellate review.  "[S]tate prisoners must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of

the State's established appellate review process, including review by the state's

court of last resort, even if review in that court is discretionary." Pruitt v. Jones, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (citing O'Sullivan, 526 U.S. at 845).

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." Smith, 256 F.3d at 1138. "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." Henderson, 353 F.3d at 891(quoting Judd v. Haley, 250 F.3d at 1313).

As stated above, only two, narrow circumstances excuse a procedural default. First, a petitioner may obtain federal habeas review of a procedurally defaulted claim upon demonstrating both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires the demonstration of an objective factor external to the defense that impeded the effort to raise the claim properly in the state court. Henderson, 353 F.3d at 892; Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995). To show "'prejudice," Brown must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Hollis v. Davis, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). Brown must

show at least a reasonable probability of a different result absent the default. Henderson, 353 F.3d at 892.

Second, without a showing of cause or prejudice, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Henderson, 353 F.3d at 892. This exception is available only "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." Henderson, 353 F.3d at 892. The fundamental miscarriage of justice exception requires a petitioner's "actual" innocence rather than his "legal" innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (2001) (citing Calderon v. Thompson, 523 U.S. 538, 559 (1998)); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, if a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995). In addition, " ' [t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." Calderon, 523 U.S. at 559 (quoting Schlup, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted).

Schlup requires the petitioner to show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence -- that was not presented at trial."

Schlup, 513 U.S. at 324. This fundamental miscarriage of justice exception is

unavailable unless "the petitioner shows, as a factual matter, that he did not commit

the crime of conviction." Ward v. Cain, 53 F. 3d 106, 108 (5th Cir. 1995) (denying

certificate of probable cause) (footnote omitted).

"[A]n ineffective assistance of counsel claim being used for cause to excuse a

procedural default of another claim is not itself excepted from the doctrine of

procedural default." Henderson, 353 F.3d at 896. In Carpenter, 529 U.S. at

451-52, a habeas petitioner argued ineffective assistance of counsel as cause for

his procedural default of other constitutional claims in the Section 2254 petition.

Because he failed to raise this ineffective assistance claim in state court, Carpenter

was procedurally barred from raising the claim in federal court. The Supreme Court

held that, unless the petitioner could establish cause and prejudice to excuse his

procedural default of the ineffective assistance claim, Carpenter was barred from

using the ineffective assistance claim as a basis for cause to excuse his procedural

default of the underlying claim. Carpenter, 529 U.S. at 451-53.

### No Presumption that the State Court Ignored Its Procedural Rules

Finally, no presumption exists that a Florida court ignores Florida's procedural

default rule by issuing only a summary denial of relief. A summary denial creates

no suggestion that the state court resolved the federal claim rather than the

independent and sufficient state claim. See Coleman, 501 U.S. 722, 735-36 (1991);

Kight v. Singletary, 50 F.3d 1539, 1544-45 (11th Cir. 1995) (applying procedural bar

notwithstanding the state court's summary dismissal); Tower v. Phillips, 7 F.3d 206,

209 (11th Cir. 1993) (applying bar absent the state court's ruling on claims presented).

## B. Standard for Ineffective Assistance of Counsel

Under Strickland v. Washington, 466 U.S. 668, 687-88 (1984), a claim of ineffective assistance of counsel requires a demonstration (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993), clarifies that the prejudice prong of the Strickland test, which focuses not merely on outcome determination, requires that the putatively deficient representation rendered the trial fundamentally unfair or the result unreliable.

A strong presumption persists that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Accord Gates v. Zant, 863 F.2d 1492, 1497 (11th Cir. 1989).

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992), instructs:

The test [for ineffective assistance of counsel] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. Strickland encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers'

> performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

(citation omitted). Under the principles expounded in <u>White</u>, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).

## **DISCUSSION**

Brown's petition stands fully briefed and ripe for decision. No evidentiary hearing is necessary because the record is fully developed and the claims in the petition raise issues of law, not issues of fact. <u>See</u> <u>Breedlove v. Moore</u>, 279 F.3d 952, 959 (11th Cir. 2002).[1] Because of the deference due the state courts' findings of fact and conclusions of law, the state courts' determination of Brown's claims largely governs review of those same claims. Consequently, in determining the reasonableness of the state courts' determinations, the review of Brown's claims includes a recitation of the pertinent state court's analysis.

### Ground One

The Execution of Paul Alfred Brown, a Mentally Retarded and Brain Damaged Offender, Would Constitute Cruel and Unusual Punishment Under the Constitution of the State of Florida and the United States.

Ground one is a claim under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), which holds that execution of a mentally retarded offender constitutes "excessive" punishment under the Eighth Amendment to the United States Constitution.

_____

[1] The post-conviction court conducted evidentiary hearings on Brown's ineffective assistance of counsel and mental retardation claims. The court's findings are "presumed to be correct," 28 U.S.C. § 2254(e)(1), and there is no showing that its decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

Because the post-conviction court held a full evidentiary hearing on this issue,[2] and the Florida supreme court affirmed the denial of relief on appeal, <u>Brown v. State</u>, 959 So. 2d 146 (Fla. 2007), ground one is exhausted.

## Legal Standards for Determining Mental Retardation

### A.  Atkins' Mental Retardation Definition

<u>Atkins</u> declines to furnish a definitive legal definition of "mental retardation" or "mentally retarded" and offers instead two clinical definitions:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows:  "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly sub-average intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18."

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly sub-average general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

<u>Atkins</u>, 536 U.S. at 308 n.3.  (citations omitted).  An IQ of 75 is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  <u>Atkins</u>, 536 U.S. at 309 n.5.  Further, "clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant

---

[2] The evidentiary hearing testimony is found at Respondent's Exhibits AA-4 through AA-7.

limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." Atkins, 536 U.S. at 318.

B.  Florida Law on Mental Retardation

Section 921.137, Florida Statutes, which was signed into law on June 12, 2001, a year before the Supreme Court's June 20, 2002, ruling in Atkins,[3] exempts the mentally retarded from the death penalty and defines mental retardation as "significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." § 921.137(1), Fla. Stat. (2008) ("Section 921.137").  The Florida supreme court has consistently interpreted the statute's definition of "significantly sub-average general intellectual functioning" to require a defendant seeking exemption from execution to establish an IQ of 70 or below. See Phillips v. State, 984 So. 2d 503, 510 (Fla. 2008) (citing Cherry v. State, 959 So. 2d 702, 711-14 (Fla. 2007) (finding that Section 921.137 provides a definitive demarcation at an IQ of 70), Jones v. State, 966 So. 2d 319, 329 (Fla. 2007) ("Under the plain language of the statute, significantly sub-average general intellectual functioning correlates with an IQ of 70 or below."), and Zack v. State, 911 So. 2d 1190, 1201 (Fla. 2005) (exempting from execution a defendant meeting Florida's standard for mental retardation, which requires establishing an IQ of 70 or below)).  Section 921.137(8) excludes a defendant sentenced to death before the statute's effective date.

---

[3]  Recognizing that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," a state is permitted to develop "appropriate ways to enforce the constitutional restriction."  Atkins, 536 U.S. at 317.

However, both the post-conviction court and the Florida supreme court used the

statutory definition to decide Brown's mental retardation claim.

<u>Brown's Alleged Facts in Support of Ground One</u>

Paul Brown scored 72 (in the mentally retarded range) at age 10 on a standardized Wechsler Intelligence Test.  Evidence of concurrent deficits in his adaptive functioning were documented in teachers' reports.  Most recently, Paul Brown scored two standard deviations below the mean on three Wechsler Intelligence Tests as defined in F.S. § 921.137 in 2001, 2003, and 2004.  Mr. Brown's score on the 1960 intelligence test is of great significance because it establishes the onset of significant sub-average intellectual functioning (one prong necessary to establish mental retardation) as existing prior to age 18.

The State court did not address the evidence presented relevant to the 1960 test. Brown's initial IQ score of 72 was rejected although all experts agree that a score of 72 falls within the accepted IQ range for mental retardation.

The trial court stated that Florida Statute requires an IQ score of 70 or less for a finding of mental retardation and stated that Florida Statute, Section 921.137 "suggests a three prong test to determine whether a defendant is mentally retarded. Prong one requires an IQ of 70 or less." (S. ROA, Vol. 5, p. 778-782, Order Denying Relief, April 22, 2005, p. 779).  The Statute itself does not specify that an intelligence quotient must automatically fall at a specific point score (i.e.) 70 or below.  The Statute adopts broader language that requires a score "two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Department of Children and Family Services. Fla. Stat. § 921.137 (2003).  Experts at Paul Brown's evidentiary hearing explained that the DSM-IV-TR is the diagnostic manual used by experts in treating and diagnosing mental retardation and while the manual adopts the two standard deviation cut off it also instructs that a standard error of measure of plus or minus five (5) points is applicable (emphasis added).[4]  Therefore, an individual who scores within the [ ] range of 70 to 75 can be diagnosed as mentally retarded.

The trial court erred when stating, "Drs. Prichard and Maher each tested the Defendant and found that the recent IQ scores suggesting a range of mild mental retardation were a result of malingering." (S.

_____

[4] The petition does not show any emphasis in this section of the factual allegations.

ROA, Vol. 5, p. 778-782, Circuit Court's Order Denying Relief, April 22, 2005, p. 780). This finding is contrary to the record. Neither Dr. Prichard or Maher te[sted] Brown for malingering. Furthermore, Dr. Maher did not testify that the test results supported a conclusion that Brown gave less than a full effort. (S. ROA, Vol. 6, p. 1077).

Only one expert, Dr. Valerie McClain, tested Brown on a Rey 15 for objective evidence as to malingering. Dr. McClain testified that there are 16 indicators used to clinically assess for malingering and that the results of her testing does **not** support evidence of malingering (emphasis added). (S. ROA, Vol. 6, pp. 907, 908). According to Drs. McClain and Maher, objective test results do not support any evidence of malingering. (S. ROA, Vol. 6, p. 1080). Therefore the State court's finding that both experts Prichard and Maher tested Mr. Brown and found that the mild mental retardation scores resulted from Brown's malingering is clearly error that is refuted by the record.

Dr. McClain described the retrospective analysis of Brown's adaptive functioning that is conducted in such cases to establish onset. She stated that she looked at his environment from conception to age 18. She reviewed his academic records, interviewed teachers and relatives, gathered information about his daily living activities during this period, and considered his severely abusive environment. (S. ROA, Vol. 6, pp. 907, 908). Dr. McClain stated that a clinical decision is made based upon the criteria of mental retardation looking at adaptive functioning in conjunction with the intellectual functioning. (S. ROA, Vol. 6, p. 908). All experts concurred with Dr. McClain's testimony that a diagnosis of mental retardation cannot be made based upon either intellectual or adaptive functioning **alone** as each [ ] prong must be **individually evaluated** (emphasis added).

The definition of mental retardation in Fla. Crim. R. 3.203(b) is "significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." It is identical to Fla. Stat. § 921.137(1) that defines mental retardation as "significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18."

Dr. McClain properly referred to Mr. Brown's early history to establish that his mental retardation manifested prior to age 18 as required by rule and by Florida's Statute. She reviewed not only Brown's early tests but all tests administered throughout his lifetime, the trial testimony at trial and adaptive functioning evaluations

completed by Dr. Prichard. Dr. McClain was the only evaluator who undertook to retrospectively evaluate Brown, in accordance with the criteria set forth by the U.S. Supreme Court in <u>Atkins</u>.

The trial court stated, "Dr. Prichard explained that due to the fact that Defendant's present adaptive functioning did not meet the criteria for mental retardation, there was no need to address the third prong of the test for retardation." (The third prong referred to is that statutory requirement for the onset of deficits to be established prior to age 18). (S. ROA, Vol. 5, p. 778-782, Order Denying Relief, April 22, 2005, p. 780). The trial court's statement is not supported by the record.

Dr. Prichard testified that he did not evaluate Brown's adaptive functioning prior to age 18 "because [I] had so much data when Mr. Brown was an adult that said intellectually he's not below 70. So . . . if that's demonstrated there's really no need to get the adaptive behavior stuff prior to the age of 18." (S. ROA, Vol. 6, pp. 954, 955). As an example Dr. Prichard stated "[I]f I have enough information to say he's not MR in terms of IQ, I have really no need to do anymore." (S. ROA, Vol. 6, p. 958). Clearly, Dr. Prichard was referring to Brown's intellectual testing (IQ) tests and was not referring to his current adaptive skills. Dr. Prichard never testified that it was a lack of deficits in Brown's adaptive behavior that kept him from going forward. He testified that test results showing Brown's intellectual functioning above 70 as an adult were the reason he did [sic] decided not to test adaptive skills prior to age 18.

Dr. Prichard's report (admitted in evidence at the evidentiary hearing) shows that: Mr. Brown scored at 57 on the SIDR (78 in communication, 53 in personal living, 64 in community living, and 54 with a broad independent support score of 57) he determined Mr. Brown to have "an overall measure of adaptive behavior, **comparable to that of the average individual at age 10 years 11 months.** His functional independence is **limited to very limited**" and "**limitations in twelve adaptive skills areas**: fine-motor skills, social interaction, language comprehension, language expression, eating and meal preparation, dressing, personal self-care, domestic skills, time and punctuality, money and value, work skills, and home/community orientation" based on information received from Mr. Brown. Dr. Prichard scored Mr. Brown at 80 (Standard score of 87, communication of 77, personal living of 85 and community living of 81) "an overall measure comparable to that of the **average individual at age 15 years 10 months**. His functional independence is limited to age-appropriate" and he found "**limitations in ten adaptive skills areas**: fine-motor skills, social interaction, language comprehension, language

expression, eating and meal preparation, dressing, domestic skills, time and punctuality, money and value, and home/community orientation" based upon information received from Sgt. Young at Union Correctional.  (S. ROA, Vol. 6, pp. 947, 948) (S. ROA, Vol. 2, pp. 261, 262, Report of Adaptive Behavior Testing, March 3, 2003, Gregory A. Prichard, Psy. D.).  Dr. Prichard's report confirms the presence of current deficits in numerous areas of Brown's adaptive functioning. The state court's findings to the contrary are not support[ed] by the record.

After the State and Defendant presented evidence on the mental retardation issue at Evidentiary Hearings, the Court sua sponte appointed a third expert -- Dr. Maher to render an opinion [in] this case. Dr. Maher administered another intelligence test on Brown and again his score was in the mentally retarded range for intellectual functioning. He found the 14 point difference between the verbal and performance IQ scores noted in Brown's test consistent with some organic brain damage or developmental impairment.  (S. ROA, Vol. 7, pp. 1081,82). [Dr.] Maher agreed that mentally retarded individuals have a prevalence of having a co-morbid mental disorder four to five times greater than the population and can have superimposed mental health problems, (i.e.) brain damage and still be diagnosed as mentally retarded.  (S. ROA, Vol. 7, pp. 1083, 1084, 1110).  Dr. Berland testified at Brown's trial that he suffers from brain damage.  (S. ROA, Vol. 7, p.1081).  Dr. Afield testified at Brown's trial that he believed him to be mentally retarded.  (S. ROA, Vol. 5, p. 781).  The evidence presented at Brown's evidentiary hearing supports the presence of a co-morbid diagnosis in this case of mental illness and mental retardation and the state court's contrary findings are not supported by the record below.

Dr. Maher testified that he took all of Paul Brown's test scores and averaged them.  The highest score of 99 and the lowest score of 57 were taken off and he computed an average of 77.6.  (S. ROA, Vol. 6, p. 1004).  He stated that the 77.6 average score he obtained was inconsistent with the score of 69 that he obtained from his own testing of Paul Brown.  (S. ROA, Vol. 6, p. 1009).  He testified that based upon his averaging of scores 77.6 must be considered the most reliable and accurate IQ score for Paul Brown, even though Mr. Brown has never tested at 77.6 on a current version of any IQ test administered to him during his lifetime.  (S. ROA, Vol. 6, pp. 1024, 1025).  Dr. Maher testified that he had no information as to which edition of the California Achievement Test was given to Paul Brown, whether it was administered individually or even scored correctly.  (S. ROA, Vol. 6, pp. 1026, 027).  Dr. Maher testified that he had no information to identify the tests, how they were administered, or raw material relating to tests

identified in his report -- Kent (score 57), Department of Corrections (score 94), Fl. Dep't Corrections/Beta (score 97), DOC (test type not reported) (score 99). (S. ROA, Vol. 26, pp. 1027-1030).

Dr. Michael Maher testified that he was familiar with the provisions of Florida Administrative Code Rule 65 B-4.032. (S. ROA, Vol. 6, p. 1019). In order to establish that tests other than those specified in the rule (Stanford-Binet Intelligence Scale or Wechsler Intelligence Scale) can be considered by the court as valid and reliable measures of intelligence, the rule states that such evaluations are to be submitted to the court and that they **shall** be accompanied by the published validity and reliability data for the examination. Furthermore, Dr. Maher did not provide any information relative to several tests that he used or literature to support his averaging of Brown's various test scores. No published validity and reliability data, as required by the rules before the court can consider them was presented for BETA tests that the court considered in evaluat[ing] Brown's mental retardation claim.

Expert testimony was presented that BETA tests are not synonymous with intellectual assessment instruments, that they are primarily non-verbal, are only one part of the full scale IQ used as a general screening measure and are not a full scale intellectual measure. BETA'S were described as short in comparison to Wechsler instruments and instruments that do not appropriately assess a comprehensive range of different intellectual skills and abilities. (S. ROA, Vol. 6, pp. 856, 857). BETA tests are not used Developmental Services in establishing mental retardation." [sic][5] (S. ROA, Vol. 7, p. 1106). Expert testimony was presented that BETA tests should not be accorded the same weight as a Wechsler or Stanford Benet Intelligence tests with respect to establishing mental retardation because BETA tests can give the impression of greater ability than actually possessed by the individual. Dr. McClain testified that it is not permissible to use a BETA to test for mental retardation because it is not one of the specified tests allowed by Developmental Services in the State of Florida for diagnosis [sic] for diagnosing mental retardation as both verbal and non verbal abilities must be assessed. (S. ROA, Vol. 7, 1105, 1106).

Dr. McClain testified that it is inappropriate to consider BETA tests equivalent to intellectual assessment instruments and to average these scores to reach a conclusion for the purpose of diagnosing

---

[5] This incomplete, incoherent sentence is as written in the amended petition at pp. 18-19 (Doc. 59).

mental retardation.  (S. ROA, Vol. 6. pp. 856,857).  Literature in the psychological community that questions the use of BETA tests as intelligence tests was referenced.  See:  Dr. George Barroff, "Establishing Mental Retardation In Capital Cases:  A Potential of Life and Death," **AAMR Vol. 29, No. 6 (1991)**, that notes a common discrepancy of 20 to 30 points with respect to revised Beta measure as compared to either the Stanford Benet, Version IV, Wechsler Intelligence Scale, Version III.  (S. ROA, Vol.7, p. 1105).  Dr. Maher agreed that BETA tests are a limited non-verbal test and did not testify that BETA and WAIS are comparable.  (S. ROA, Vol. 7, pp. 1049, 1050).  In cross examination, Dr. Prichard conceded that BETA tests are not [ ] specified for use in measuring intellectual abilities. (S. ROA, Vol. 6, p. 934).

Dr. Maher added up several IQ test scores and divided them up to arrive at a full scale intelligence score.  He testified that he was "making a strongly and statistically validated educational guess."  (S. ROA, VOL. 7, p. 1047).  [Dr.] Maher provided no professional literature to support his decision to averag[e] all of Brown's tests or any literature to support that averaging intelligence test scores over an individual's lifetime to determine actual full scale IQ is an acceptable practice in the scientific community.  (S. ROA, Vol. 7, p. 1048). Dr. McClain testified that averaging is not a permissible practice in the psychological community.  It is not possible to average the same test let alone varied intelligence tests due to the different reliability and validity levels of each test opinions based upon some averaging method without documentation to support the validity of his assertions as required by the rule.  (S. ROA, Vol. 6, pp. 856, 857).

Mr. Brown has significant sub-average intellectual functioning as reflected on Intelligence Tests that are specified as instruments for use in Florida Administrative Code Rule 65 B-4.032(1) for determining mental retardation pursuant to Fla. R. Crim. P. 3.203 in Florida.  A school psychiatrist gave ten-year-old Paul Brown a Wechsler Intelligence Scale in September, 1960 and recorded his full scale IQ in the mentally retarded range at 72 at age 10.  In 1962, he was recommended for special placement with slow learners and the severity of his problems was documented in psychological reports and records that reveal that he repeated the fifth grade three times before quitting school in the sixth grade at age 14.  (S. ROA, Vol. 2, p. 223).  In 1987, Dr. Berland, Ph.d. characterized him as "slow cognitively" (S. ROA, Vol. 2, p. 294) and Dr. Dee, Ph.d. noted "bilateral cerebral involvement or brain damage."  (S. ROA, Vol. 2, State's Exhibit 3, p. 219).  Dr. Berland and Dr. Dee reported that Mr. Brown was functioning at a low

intellectual level and both documented adaptive behavior deficits within their respective reports.

The record reflects that outdated test versions skewed some of Mr. Brown's test results. The American Educational Research Association and the National Counsel on Measurements in Education, 1990 Standard for Educational and Psychological Testing states that it is inappropriate to use dated tests and norms. When test scores are properly adjusted as recommended by the professional literature, (Dr. Berland's score in 1986 is 70 and Dr. Dee's score in 1993 is 72.) Brown's testing near the time of the crime is then consistent with the sub-average intellectual functioning level reflected in his 1960 test (72) and with all of Brown's most recent test scores (2001-63, 2003-68 and 2004-69).

A Wechsler Adult Intelligence Scale (3rd Ed) given by Dr. Valerie McClain, Ph.D., on July 2, 2001 recorded Mr. Brown as having a verbal IQ performance at 61 and a performance IQ at 73 with full scale IQ at 63. (S. ROA, Vol. 6, p. 863). Dr. Gregory Prichard administered the same test on March 3, 2003, recording Paul Brown's verbal IQ performance at 69, performance IQ at 73 and full scale IQ score at 68. Dr. McClain testified that the results in both tests are very consistent in result and cited a "practice effect" (recognized by psychologists when a subject is repeatedly tested on the same instrument) as the basis for a difference of five to six points noted on the verbal portion of the test. (S. ROA, Vol. 6, p. 867). When tested a third time on the same testing instrument, the Wechsler Adult Intelligence Scale (3rd Ed.), Dr. Michael Maher also reported Paul Brown's full scale IQ score at 68 or 69. (S. ROA, Vol. 7, p. 1071). Mr. Brown has tested in the mentally deficient range [only] once prior to age 18 and on three individually administered intelligence tests. He has clearly established the fact that his intellectual functioning falls within the mentally deficient range.

Mr. Brown is complex because he has also established a co-morbid diagnosis. He suffers from mental illness, brain damage and mental retardation. In rejecting his claim for relief the State Court failed to recognize professional standards used by psychologists when determining mental retardation as recognized by the U.S. Supreme Court in <u>Atkins v. Virginia</u>. Denial of Mr. Brown's claim that he is mentally retarded claim [sic] resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

(Petition, pp. 11-22).

<u>Ground One Lacks Merit</u>

Affirming the post-conviction court's finding that Brown is not mentally retarded, the Florida supreme court noted the post-conviction court's consideration of the conflicting testimony of Dr. Valerie McClain, Dr. Gregory Prichard, and Dr. Michael Maher:

> In September of 2001, Brown filed a successor motion to vacate sentence,[FN1] asserting that he is mentally retarded based on the definition provided in section 921.137, and hence the penalty of death must be vacated. The trial court held an initial evidentiary hearing in the case, at which time the State and the defendant presented conflicting expert opinions as to whether Brown was mentally retarded. Brown presented Dr. Valerie McClain, and the State presented Dr. Gregory Prichard. The court then appointed its own expert, Dr. Michael Maher, and an additional evidentiary hearing was conducted. On April 25, 2005, the lower court entered an order denying relief as follows:

>> As in <u>Bottoson [v. State</u>, 813 So. 2d 31 (Fla. 2002)], three doctors were enlisted to evaluate the mental capacity of Defendant in regard to the instant motion. Drs. Valerie McClain, Gregory Prichard, and Michael Maher each submitted an evaluation on defendant's mental capacity and testified as to their findings. Drs. Prichard and Maher determined Defendant to be mentally competent, but Dr. McClain found Defendant to be mildly mentally retarded.

>> The Court has struggled with the determination made by Dr. McClain. Recent testing suggests that Defendant's IQ is near the mildly mentally retarded range. However, Dr. McClain's report of Defendant's adaptive functioning indicates that Defendant would be classified in the severely mentally retarded range. It is this inconsistency in Dr. McClain's reporting that gives the Court pause.

>> It seems that Dr. McClain relies very heavily on the language of the rule regarding the onset of mental deficits prior to age 18, ignoring the fact that mental deficits must manifest by age 18 and exist presently. Dr. Prichard specifically addresses this point during his testimony. Furthermore, on cross-examination, defense counsel

inquired into Dr. Prichard's reasoning for failing to interview individuals to comment on Defendant's adaptive functioning prior to age 18. Dr. Prichard explained that due to the fact that Defendant's present adaptive functioning did not meet the criteria for mental retardation, there was no reason to address the third prong of the test for retardation.

Dr. McClain testified regarding Defendant's ability to maintain a five-year intimate relationship, "I do believe that was after he was 18." That Defendant may have been described at an early age as having socialization issues, does not mean that he satisfies the statutory definition of mentally retarded if he is currently able to socialize and adapt at an acceptable level. The mental deficits have to manifest prior to 18 and continue to exist presently, or concurrently with significant sub-average general intellect. Dr. McClain failed to report on Defendant's current adaptive functioning.

Contrary to Dr. McClain's assessment, Drs. Prichard and Maher each tested the Defendant and found that the recent IQ scores suggesting a range of mildly mentally retarded were a result of malingering.[n.1] Dr. Prichard believes Defendant to be in the "high end of the borderline range or at the low end of the average range." According to Drs. Prichard and Maher, it is reasonable to believe that a person in Defendant's situation has a strong motivation to perform poorly on examinations in order to be declared mentally retarded.

> [n.1] Dr. Prichard testified that he did not believe Defendant's IQ score of 68 represented an accurate reporting. Specifically, Dr.Prichard felt that Defendant was purposely hesitating in giving responses.

> Dr. Maher testified that he believed the testing he performed on Defendant did not accurately reflect Defendant's true intellectual capabilities.

Likewise, the results of the Vineland test administered by Dr. Prichard suggest Defendant is not mentally retarded in terms of adaptive functioning.[n.2] Dr.

Prichard commented on the level of support needed by an individual that scores 29 in adaptive functioning--the value attributed by Dr. McClain in her examination:

> An adaptive functioning of 29 would correspond to a support level of extensive. It would mean the person would need extensive support, which is characterized by individuals requiring extensive or continuous support and supervision. For example, an individual may attain beginning self-care skills, but may need continuous supervision from someone within the same room or nearby.

> [n.2]  Dr. Prichard testified that he has administered the Vineland test approximately 300 times.  Dr. Prichard's results from the administration of the Vineland test was accepted by the trial court in Bottoson v. State, 813 So. 2d 31 (Fla. 2002).

Dr. Prichard's examination supports the fact that Defendant is clearly capable of caring for himself and places extreme doubt on the validity of Dr. McClain's assessment.[n.3]  Therefore, the Court finds Dr. Prichard's and Dr. Maher's analysis to be accurate. Based on Dr. Prichard's, Dr. Maher's, and the Court's observations of the Defendant and on the doctors' determination that Defendant is not mentally retarded, the Court finds that Defendant is not entitled to the relief requested.

> [n.3]  Dr. Prichard lists the tasks Defendant has been able to perform and continues to do.

[FN1]  The motion also requested the trial court to declare a provision of section 921.137, Florida Statutes (2001), unconstitutional since section (8) of the statute stated that it was not to be applicable to defendants who were sentenced to death prior to the effective date of the act.  Following Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), we adopted Florida Rule of Criminal Procedure 3.203, which adopted the statutory definition of mental retardation and recognized that Atkins applies to defendants currently on death row.  See Phillips

v. State, 894 So. 2d 28, 39-40 (Fla. 2004) (holding that one may file an Atkins claim under rule 3.203 even if section 921.137 did not exist at time of sentencing). This renders moot the claim that the statute is unconstitutional. Moreover, the trial court determined Brown's claim of mental retardation using the statutory definition.

Brown v. State, 959 So. 2d at 147-48 (Fla. 2007).

The Florida supreme court next concluded that Brown's claim invited the appellate court both to attribute greater weight to testimony rejected by the post-conviction court and to discredit testimony found more credible by the post-conviction court. The court found:

> To establish mental retardation, Brown must demonstrate all three of the following: (1) significantly sub-average general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. Fla. R. Crim. P. 3.203(b). The trial court determined that based on the three experts' evaluations, Brown did not come within the definition of mental retardation. When reviewing the trial court's findings relative to the existence of mental retardation, this Court looks to whether competent, substantial evidence supports the trial court's findings. See Trotter v. State, 932 So. 2d 1045, 1049 (Fla. 2006). This Court does not re-weigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses. Id. at 1050. As stated in Tibbs v. State, 397 So. 2d 1120 (Fla. 1981):

> > As a general proposition, an appellate court should not re-try a case or re-weigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the (decision).

> Id. at 1123 (footnote omitted).

> The testimony presented at the evidentiary hearing showed that Brown has seen numerous mental health experts since he was ten years old. Several IQ tests placed Brown in the mildly mentally retarded range, and there were references as to some deficits in his

adaptive functioning skills. On the other hand, some of his IQ scores were higher than what a mentally retarded person would have, particularly as to Brown's performance IQ. Dr. McClain offered one explanation of this disparity, contending that the higher scoring tests were not the proper tests or they were outdated and needed to be adjusted. The other experts disagreed that an adjustment was needed and further asserted that these higher IQ scores established that Brown was capable at times of performing better than one who is mentally retarded. As a result, they concluded that any deficits in Brown's IQ were not caused by mental retardation but were caused by malingering and mental disorders which appeared on a sporadic basis.

In Cherry v. State, No. SC02-2023, 959 So. 2d 702, 2007 WL 1074931 (Fla. Apr. 12, 2007), we held that the statutory definition of mental retardation required a showing that a defendant had an IQ score of 70 or below. Here, the trial court found that there was a question as to the accuracy of the IQ testing and proceeded to the evaluation of the second prong of the statutory definition of mental retardation, i.e., concurrent deficits in adaptive behavior. As to this second prong, the case became a conflict between the opinions of the experts which had to be resolved by the trial judge after weighing the evidence, listening to the expert testimony, and judging overall credibility of each. The trial judge's order denying relief clearly showed that the court was troubled with the testimony of Brown's expert, Dr. McClain, particularly in regard to her report that Brown's adaptive functioning indicates that he is in the severely mentally retarded range and would need extensive or continuous support. This report was contradictory to the evidence that Brown was engaged in a five-year intimate relationship prior to the crime, that he had his driver's license and drove a car, and that he was employed in numerous jobs including as a mechanic.

In this appeal, the defendant essentially argues that the trial court should have weighed Dr. McClain's testimony more heavily and discounted the testimony of Drs. Prichard and Maher based on the testimony of Dr. McClain. However, questions relating to evidentiary weight and credibility of witnesses are reserved to the trial court. See, e.g., Trotter, 932 So. 2d at 1050 ("[T]he question of evidentiary weight is reserved to the circuit court, and this Court does not re-weigh the evidence. . . . The determination of the credibility of witnesses also is reserved to the trial court."); Bottoson v. State, 813 So. 2d 31, 33 n.3 (Fla. 2002) ("We give deference to the trial court's credibility evaluation of Dr. Pritchard's and Dr. Dee's opinions."); Porter v. State, 788 So. 2d 917, 923 (Fla. 2001) ("We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact."). In this case, the trial court clearly found that Dr.

McClain's testimony was not as credible as the testimony presented by the other expert witnesses. After all conflicts in the evidence and all reasonable inferences have been resolved in favor of the trial court's decision, there is competent, substantial evidence to support this decision.

As the record provides competent, substantial evidence supporting the trial court's findings, we affirm the decision that Brown is not mentally retarded.

Brown v. State, 959 So. 2d at 148-50 (Fla. 2007) (footnote omitted).

Brown fails to satisfy his burden, required by AEDPA, to show that the state court determination is contrary to or an unreasonable application of governing federal law as determined by the Supreme Court. Brown may not obtain federal habeas corpus relief merely because he asserts that the trial court should have accorded greater weight to the testimony of a defense witness than to a witness for the State. The state court's credibility determination (that the defense's expert witness was not credible compared to both the State's expert witness and the court's appointed expert witness) and the factual determination (Brown's IQ score) bind this court. Federal jurisprudence is in accord with the Florida supreme court's deference to the judge who heard the witnesses testify. Baldwin v. Johnson, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [counsel's] testimony over [petitioner's].", cert. denied, 526 U.S. 1047 (1999), and Devier v. Zant, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are, however, entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d).", cert. denied, 513 U.S. 1161 (1995). See also 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court

shall be presumed to be correct.  The applicant shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence.").

Ground one warrants no habeas corpus relief.

<u>Ground Two</u>

Florida's lethal injection statute and the existing procedure that the
State uses for lethal injection violates the Eighth Amendment to the
United States Constitution as it will subject Mr. Brown to Cruel and
Unusual Punishment.

Ground two is fully exhausted.  Brown presented this ground in a successive

Rule 3.851 motion to vacate.

The post-conviction court denied relief and the Florida supreme court

affirmed.  The order reads, in pertinent part:

Paul Alfred Brown, a prisoner under sentence of death, appeals
the circuit court's order summarily denying his successive
postconviction motion.  <u>See</u> Fla. R. Crim. P. 3.851.  We have previously
affirmed appellant's conviction and sentence of death.  <u>See</u> <u>Brown v.</u>
<u>State</u>, 565 So. 2d 304 (Fla. 1990).  We have also affirmed the denial of
his first postconviction motion, <u>see</u> <u>Brown v. State</u>, 755 So. 2d 616 (Fla.
2000), denied his petition for writ of habeas corpus, <u>see</u> <u>Brown v.</u>
<u>Moore</u>, 800 So. 2d 223 (Fla. 2001), and affirmed the denial of his
second postconviction motion.  <u>See</u> <u>Brown v. State</u>, 959 So. 2d 146
(Fla. 2007).

In this appeal, Brown first claims that the circuit court erred in
assessing the constitutionality of Florida's lethal injection execution
procedures under the legal standard set forth in <u>Lightbourne v.</u>
<u>McCollum</u>, 969 So. 2d 326 (Fla. 2007), rather than under the legal
standard set forth in <u>Baze v. Rees</u>, 128 S. Ct. 1520 (2008).  This issue,
however, has already been decided adversely to Brown.  <u>See</u> <u>Ventura</u>
<u>v. State</u>, 2 So. 3d 194 (Fla. 2009); <u>Henyard v. State</u>, 992 So. 2d 120
(Fla. 2008); <u>Schwab v. State</u>, 995 So. 2d 922 (Fla. 2008).

Brown next contends that the circuit court erred in failing to hold
an evidentiary hearing on his claim that Florida's lethal injection
execution procedures are unconstitutional in various respects.
Because the underlying claim has already been rejected by this Court,

however, the circuit court did not err in summarily rejecting this claim. See Lightbourne; Schwab.

And finally, Brown claims that section 945.10, Florida Statutes (2008), which protects the executioners' identity, is unconstitutional in various respects. This issue, however, has already been decided adversely to Brown. See Henyard; Bryan v. State, 753 So. 2d 1244 (Fla. 2000).

Accordingly, we affirm the circuit court's order summarily denying Brown's successive postconviction motion.

Brown v. State, No. SC08-939, 2009 WL 1990022, at *1 (Fla. July 2009).

## Ground Two Lacks Merit

"Substantial risk" is the generally accepted standard across the country for determining whether a lethal injection protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment. See, e.g., Baze v. Rees, 217 S.W.3d 207, 209 (Ky. 2006) (holding that a method of execution constitutes cruel and unusual punishment if "a substantial risk of wanton and unnecessary infliction of pain, torture, or lingering death" necessarily arises), aff'd, Baze v. Rees, _____ U.S. _____, 128 S. Ct. 1520 (2008) (plurality); Taylor v. Crawford, 487 F.3d 1072, 1080 (8th Cir. 2007) ("If Missouri's protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis."); LaGrand v. Stewart, 173 F.3d 1144, 1149 (9th Cir. 1999) (holding that the Arizona district court's findings of "extreme pain, the length of time this extreme pain lasts, and the substantial risk that inmates will suffer this extreme pain for several minutes require the conclusion that execution by lethal gas is cruel and unusual").

- 29 -

The Supreme Court's most recent pronouncement on the topic is <u>Baze v.</u>

<u>Rees</u>, _____ U.S. _____, 128 S. Ct. 1520, 1531 (2008) (plurality), in which the main

decision describes the test as a "substantial risk of serious harm," a term the court

defined as "an 'objectively intolerable risk of harm' that prevents prison officials from

pleading that they were 'subjectively blameless for purposes of the Eighth

Amendment.'"  (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 842, 846, and n.9

(1994)).  The decision further explained:  "State efforts to implement capital

punishment must certainly comply with the Eighth Amendment, but what that

Amendment prohibits is wanton exposure to 'objectively intolerable risk,' . . . not

simply the possibility of pain."  <u>Baze</u>, 128 S. Ct. at 1537 (citation omitted).  <u>Ventura</u>

<u>v. State</u>, 2 So. 3d 194, 198-201 (Fla. 2009) (footnotes omitted), recently held that

Florida's lethal injection protocol complies with <u>Blaze</u>:

Ventura's Lethal-Injection Claim

> i.   Ventura has Merely Reiterated the Claims Presented by
> <u>Lightbourne</u> and <u>Schwab</u>
>
> We have repeatedly and consistently rejected Eighth
> Amendment challenges to Florida's current lethal-injection protocol.
> <u>See</u> <u>Tompkins v. State</u>, 994 So. 2d 1072, 1080-82 (Fla. 2008); <u>Power</u>
> <u>v. State</u>, 992 So. 2d 218, 220-21 (Fla. 2008); <u>Sexton v. State</u>, 33 Fla. L.
> Weekly S686, S691 (Fla. Sept. 18, 2008); <u>Schwab v. State</u>, 995 So. 2d
> 922, 924-33 (Fla. 2008); <u>Woodel v. State</u>, 985 So. 2d 524, 533-34
> (Fla.2008), <u>cert. denied</u>, ___ U.S. ___, 129 S. Ct. 607, ___ L.Ed.2d ___
> (2008); <u>Lebron v. State</u>, 982 So. 2d 649, 666 (Fla. 2008); <u>Schwab v.</u>
> <u>State</u>, 982 So. 2d 1158, 1159-60 (Fla. 2008); <u>Lightbourne v. McCollum</u>,
> 969 So. 2d 326, 350-53 (Fla. 2007).  In his post-conviction motion and
> brief to this Court, Ventura has simply re-alleged the criticisms of
> Florida's revised protocol that Lightbourne and his expert, Dr. Heath,
> presented in 2007.  <u>See</u> <u>Lightbourne</u>, 969 So. 2d at 347-49. Ventura
> has not presented any allegations beyond those of Lightbourne and
> Schwab (who predicated his claims upon those of Lightbourne).

This Court has thus previously rejected each of these challenges to Florida's lethal-injection protocol and--based upon the sound principle of stare decisis--we continue the same course here. See, e.g., Lightbourne, 969 So. 2d at 349-53; Schwab, 969 So. 2d at 321-25. As we stated in Schwab, "Given the record in Lightbourne and our extensive analysis in our opinion in Lightbourne v. McCollum, we reject the conclusion that lethal injection as applied in Florida is unconstitutional." Schwab, 969 So. 2d at 325.

ii. Baze Does Not Require Reconsideration of Lightbourne and Related Decisions

The only "new" contention Ventura presents is that our recent lethal-injection decisions, including Lightbourne, have not applied the standard articulated by the Baze plurality. However, Ventura overlooks that we explicitly held in Lightbourne:

> In light of the[ ] additional safeguards [present in the August 2007 lethal-injection protocol] and the amount of the sodium pentothal used, which is a lethal dose in itself, we conclude that [the petitioner] has not shown a substantial, foreseeable or unnecessary risk of pain in the DOC's procedures for carrying out the death penalty through lethal injection that would violate the Eighth Amendment . . . .

969 So. 2d at 352-53. (footnote omitted) (emphasis supplied). Our analysis thus provided that Florida's current lethal-injection protocol is constitutional under either a substantial-risk, foreseeable-risk, or unnecessary-risk standard. This Court also recently observed in Tompkins that "we have rejected contentions that Baze set a different or higher standard for lethal injection claims than Lightbourne." 994 So. 2d at 1081. We now take this occasion to explain why this is so.

The disjunctive phrasing of our holding in Lightbourne has proven prescient because the United States Supreme Court has not yet adopted a majority standard for determining the constitutionality of a mode of execution. See generally Baze v. Rees, ___ U.S. ___, 128 S. Ct. 1520, 170 L.Ed.2d 420 (2008). Specifically, the Baze plurality adopted a version of the substantial-risk standard, while Justice Breyer, concurring in the judgment, and Justices Ginsburg and Souter, dissenting, adopted a version of the unnecessary-risk standard. See id. at 1525-38 (Roberts, C.J., joined by Kennedy and Alito, JJ.); id. at 1563-67 (Breyer, J., concurring in the judgment); id. at 1567-72 (Ginsburg, J., dissenting, joined by Souter, J.). In contrast, Justices

Thomas and Scalia renounced any risk-based standard in favor of a rule of law that would uphold any method of execution which does not involve the purposeful infliction of "pain and suffering beyond that necessary to cause death." Id. at 1556-63 (Thomas, J., concurring in the judgment, joined by Scalia, J.). Justice Stevens did not provide a separate standard but, instead, expressed general disagreement with (1) the death penalty based upon his long experience with these cases and the purported erosion of the penalty's theoretical underpinnings (deterrence, incapacitation, and retribution), and (2) the allegedly unnecessary use of the paralytic drug pancuronium bromide. See id. at 1542-52 (Stevens, J., concurring in the judgment).

Hence, the Baze Court did not provide a majority opinion or decision. In turn, this lack of consensus has complicated our duty to interpret article I, section 17 of the Florida Constitution "in conformity with the decisions of the United States Supreme Court" concerning the Eighth Amendment's bar against "cruel and unusual punishments." Under normal circumstances, we would resort to the "narrowest grounds" analysis presented in Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L.Ed.2d 260 (1977), which provides that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)). However, there are no reliable means of determining the "narrowest grounds" presented in Baze because three blocks of Justices provided three separate standards for determining the constitutionality of a mode of execution. We addressed this issue in Henyard v. State, 992 So. 2d 120 (Fla. 2008):

> We have previously concluded in Lightbourne and Schwab that the Florida protocols do not violate any of the possible standards, and that holding cannot conflict with the narrow holding in Baze. Furthermore, we have specifically rejected the argument that Florida's current lethal injection protocol carries "a substantial, foreseeable, or unnecessary risk of pain." Lightbourne, 969 So. 2d at 353. Accordingly, we reject [appellant's] argument [that we should reconsider Lightbourne and Schwab in light of Baze].

Id. at 130 (emphasis supplied). Consequently, Florida's current lethal-injection protocol passes muster under any of the risk-based

standards considered by the Baze Court (and would also easily satisfy the intent-based standard advocated by Justices Thomas and Scalia).

We also recently upheld and adopted a trial court's analysis concluding that Florida's lethal-injection protocol is "substantially similar" to that of Kentucky. See Schwab, 995 So. 2d at 924-33. This holding brings Florida's lethal-injection protocol squarely within the safe harbor created by the Baze plurality. Baze, 128 S. Ct. at 1537 (Roberts, C.J., joined by Kennedy and Alito, JJ.) ("A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." (emphasis supplied)); see also Baze, 128 S. Ct. at 1569-71 (Ginsburg, J., dissenting, joined by Souter, J.) (favorably contrasting Florida's consciousness assessment with that of Kentucky and strongly indicating that even the Baze dissenters would have approved Florida's current lethal-injection protocol under an Eighth Amendment analysis).

In its current form, Florida's lethal-injection protocol ensures unconsciousness through a pause between the injection of a lethal dose of sodium pentothal (a potent coma-inducing barbiturate) and the injection of the second and third drugs, during which time the warden engages in a thorough consciousness assessment (brushing the condemned's eye lashes, calling the condemned's name, and shaking the condemned). Further, we have held that the condemned inmate's lack of consciousness is the focus of the constitutional inquiry. See generally Lightbourne, 969 So. 2d 326 (repeatedly stressing the significance of the undisputed fact that a sufficient dose of sodium pentothal renders the condemned unconscious and that this lack of consciousness precludes the perception of any pain associated with the later injection of pancuronium bromide and potassium chloride).

Brown fails to establish, as required by AEDPA, that the state courts' determination was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. The Florida supreme court analyzed Brown's claims and applied the correct legal standard prescribed by Baze.

Ground two lacks merit and warrants no habeas corpus relief.

<u>Ground Three</u>

Mr. Brown was denied the effective assistance of counsel during the guilt/innocence phase of his trial. Counsel failed to adequately object,

investigate, and prepare a challenge to the State's case in violation of the Sixth, Eighth, and Fourteenth Amendment to the U.S. Constitution.

Brown fully exhausted this claim. The post-conviction court held an evidentiary hearing, denied the claim, and the Florida supreme court affirmed the denial of relief. Brown v. State, 755 So. 2d 616 (Fla. 2000).

Brown alleges that on the second day of the evidentiary hearing Brown presented the neuropsychological testimony of Dr. Henry Dee, who both presented the evidence of organic brain damage and explained the consequences to Brown's ability to form specific intent. Dr. Dee testified to Brown's borderline retardation with learning deficiencies and inability to cope with stress. Also, Brown alleges that attorney Alldredge, Brown's penalty phase trial counsel, testified that he would have used Dr. Dee's opinion, if available.

Brown contends that "using a wealth of independent corroborative evidence identified at post-conviction, Dr. Faye Sultan testified that she found the presence of statutory and non-statutory mitigating factors." (Petition, p. 30) Again, Alldredge testified that he would have used Dr. Sultan's opinion, if available.

Brown alleges that, if counsel had questioned others at the trailer (where Brown lived) on the night of the crime, counsel would have discovered that Jimmy Brown observed his brother Paul displaying bizarre behavior immediately before the crime. Brown contends that evidence of Brown's severe brain damage, intoxication, and mental illness would have precluded the jury from finding beyond a reasonable doubt the necessary heightened premeditation. Brown claims that defense counsel Chalu was ineffective in failing to investigate fully and discover this evidence or to

recognize the evidence's utility during the guilt phase to disprove Brown's ability to form specific intent and to premeditate the murder.

Further, Brown claims that his jury heard neither that Brown's demeanor was influenced by a potent anti-depressant and mood-altering medication (Mellaril) nor that an understanding of Brown's mental state was critical for the jury's assessing whether Brown could form the requisite intent or sustain sufficient premeditation to support the aggravating factors necessary to a death sentence.

Brown further claims that counsel was ineffective for failing to identify the medical reason warranting administration of involuntary medication to Brown, for failing to request discontinuation of the medication, and for failing to notify the jury of Brown's medicated state.

Although ground three alleges counsel's ineffectiveness during the guilt phase of the trial, Brown includes a claim of ineffective assistance of counsel during the penalty phase. Brown alleges that during the penalty phase closing argument Assistant State Attorney Michael Benito was allowed to present without objection a "day in the life argument," which was subsequently condemned by the court as improper. Brown contends that attorney Alldredge, Brown's counsel during the penalty phase, testified that he anticipated a "day in the life" argument but interposed no objection and that Alldredge offered no strategic reason for withholding objection to an allegedly improper argument. Brown concludes that Alldredge was ineffective.

Brown claims prejudicially ineffective assistance of counsel because (1) during the guilt phase the defense presented no evidence of Brown's severe

brain damage, intoxication, and mental illness and (2) during the penalty phase counsel failed to object to the "day in the life argument" and the jury voted only seven to five for the death sentence.

Ground Three Lacks Merit

In ground three, Brown relies both on the testimony of Dr. Dee, Dr. Faye Sultan, and attorney Alldredge at the post-conviction evidentiary hearing and on his criticism of prosecutor Benito's closing argument in the penalty phase. In essence, Brown continues his state court argument that the defense witnesses testified credibly at the evidentiary hearing and deserve preemptive acceptance to the exclusion of all contrary evidence.

Brown v. State, 755 So. 2d at 625-31, affirms the trial court's rejection of Brown's claim of ineffective assistance of counsel and explains:

C.  Post-conviction Evidentiary Hearing

The record of the post-conviction evidentiary hearing reflects the following. Chalu was responsible for presentation of the entire case and represented Brown during the guilt phase of the trial. As stated previously in discussing claim II, Chalu worked closely throughout the trial with co-counsel Alldredge, who represented Brown during the penalty phase only.

Chalu testified at the post-conviction hearing that, upon his appointment to represent Brown, he immediately engaged the services of psychologist Dr. Robert Berland because of "certain red flags" noticed by Chalu, such as Brown's appearing to be of "sub-average intelligence" and possibly exhibiting signs of "sub-clinical mental illness." Chalu testified that both he and Alldredge talked with Berland and other mental-health experts in order to decide upon their defense strategy and to facilitate data collection as to Brown's history. Chalu determined that nothing the experts found before the trial relevant to Brown's mental state would be useful in support of Brown's case during the guilt phase of the trial. Thus, mental health expert testimony was used only in the penalty phase. Chalu testified that he and the mental

health experts knew that Brown was receiving anti-psychotic medication at the Hillsborough County Jail but that he did not present this information to the judge or jury because he had decided not to employ a mental health defense in the guilt phase.

Chalu testified that his theory of defense was dictated by three factors: Brown's account to Chalu of how the murder had occurred; mental health experts' accounts of what they understood to be Brown's mental state at the time of the offense; and the fact that the trial court had denied the defense motion to suppress Brown's confession. Chalu explained that, once he knew the confession would be admitted into evidence, he determined that the only viable defense as to felony murder was to argue for a lesser offense of armed trespass, rather than armed burglary, which would support a verdict of third-degree murder. As to premeditated murder, Chalu's strategy was to argue, as Brown stated in his confession, that he shot the victim only on an impulse and had no pre-formed intent to kill her when he entered the room where she was sleeping and woke her.

Chalu stated that he interviewed several of Brown's relatives, including Brown's father, before the trial and determined that they could offer no testimony in support of Brown's guilt-phase defense. Chalu testified that, if he had discovered any information from family members or others relevant to premeditation, he would have presented such testimony at the guilt phase. As to his strategy of declining to present defense evidence, Chalu explained:

> [W]e had an uphill battle because once the motion to suppress confession was denied, we had to figure out some way to try to prevent the case from going into penalty phase, to try to get a lesser.
>
> So all my efforts were directed to and all the tactics that I employed in my first phase were directed to maximizing the possibility of getting a lesser, and one of those was to try to keep the opening and closing argument and not put on any evidence in the first phase.

Upon cross-examination, Chalu stated that his strategy of declining to present evidence and seeking a conviction of a lesser offense had been successful in at least one other first-degree murder trial in which he had faced prosecutor Benito.

Chalu testified that in communicating this trial strategy to Brown:

I always took great pains to try to make sure that Mr. Brown understood what we were saying because he was a little slow. . . .  We were trying to get him to understand everything we were saying and the rationale for what we were doing as much as we were able to.

Chalu testified that the prosecutor had not offered any plea bargain for a life sentence but that he had offered to allow Brown to plead guilty to first-degree murder and proceed directly to the penalty phase.  Chalu testified that he informed Brown of this option, and Brown chose to reject it.  As to Brown's consent to the defense strategy of conceding guilt to a lesser degree of murder, Chalu testified, "Mr. Brown was pretty much agreeable to pretty much everything we did, to be honest with you."

Chalu testified that he had no problem receiving information requested from the investigator assigned to the case.  As to school and jail records, Chalu stated that it was ultimately his responsibility to retrieve any relevant records and that he believed at the time of the trial that all relevant records had been gathered.  As to the State witnesses made known to defense counsel for the first time on the first day of trial, Chalu testified that he asked the judge for time to depose them, took brief depositions, and determined that their testimony was not "of any great consequence to the case."

Chalu testified that he saw no reason to move for a mistrial after learning that at least one juror had been exposed to pretrial publicity, because he was satisfied after the judge's inquiry that the jurors had not read the article in question or had only read the headline.  Therefore, he stated, it was "inconsequential and not worth pursuing any further because there was no prejudice to the jury or to Mr. Brown because of the incident."

On cross-examination by the State, Chalu testified that he had been able to keep the jury from hearing any evidence as to the State's theory of Brown's motive for this offense, which was that Brown wanted to keep the seventeen-year-old victim, who was the daughter of his girlfriend, from reporting to authorities the fact that she and Brown had had a sexual relationship.  Chalu also was able to exclude evidence of a robbery and shooting allegedly committed by Brown later on the day of the instant murder.

During the post-conviction evidentiary hearing, Brown also presented the testimony of Dr. Steven Szabo, a psychiatrist who

evaluated Brown in the Hillsborough County Jail where Brown was awaiting trial in March 1986. Dr. Szabo testified that he diagnosed Brown as schizophrenic and prescribed Mellaril, an antipsychotic medication, but that this medication was never forced upon Brown. Szabo testified that he would have presented this testimony at Brown's trial in 1987 but that he was not contacted by counsel for Brown.

After considering this evidence and argument based on this evidence, the circuit court denied Brown the relief he requested in his guilt-phase ineffective assistance claims, concluding that Brown failed to meet both the ineffectiveness and prejudice prongs of the Strickland test. The circuit court order stated in relevant part:

> The testimony of Mr. Chalu, guilt phase counsel for the defense, refutes any deficiency in investigation, objections, or preparation and the Defendant has failed to show any deficiency. Guilt phase counsel had a clear theory of defense, i.e., lack of intent, and the record shows that he meticulously prevented the introduction of highly prejudicial evidence against his client . Assuming once again that the Defendant could show some deficient performance, he does not show how such resulted in prejudice. Even with the benefit of hindsight, it does not appear that guilt phase counsel would have done things differently.

Order II at 4.

. . . .

E. Discussion of Guilt Phase Ineffective-Assistance Claims

1. Exculpatory Evidence

We begin our inquiry into whether the performance of Chalu was deficient by recognizing: (1) there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689; and (2) Brown bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. Id. at 688-89. Brown argues that Chalu failed to adequately investigate the possibility of an intoxication defense and failed to question others, including Brown's brother, Jimmy Brown, who could have testified as lay witnesses as to Brown's condition immediately preceding the crime. After the court denied the defense

motion to suppress Brown's confession, Chalu determined that the only viable defense was to concede that Brown had committed the murder and argue for a conviction of a charge less than first-degree murder. In considering his strategy, Chalu concluded that the available potential witnesses, such as Jimmy Brown, could not present evidence of Brown's state of mind prior to the murder such that an insanity or diminished capacity defense would be viable. The record reflects that Chalu also made strategic decisions not to present to the jury certain witnesses who might have revealed to the jury prejudicial information about Brown's criminal history. Chalu made an informed evaluation of his options and then presented a defense of lack of intent to commit premeditated murder. Chalu also argued that the State failed to prove intent to commit armed burglary. If successful, these defenses would have left only armed trespass as the underlying felony to support a felony murder conviction, which would not have been first-degree felony murder. In view of the trial record and the testimony of Chalu, we agree with the circuit court that Brown failed to demonstrate that the performance of Chalu fell below the <u>Strickland</u> standard. <u>See</u> <u>Strickland</u>, 466 U.S. at 691; <u>Sims</u>, 155 F.3d at 1306.

2. State Witnesses

Brown contends that Chalu failed to make an effective attack on the credibility of State witnesses Gail and Barry Barlow, who were in the house with the victim at the time of the murder, and to investigate mitigating evidence the Barlows might have provided as to Brown's mental instability, alcohol abuse, and delusional thinking. At trial, Chalu objected to their testimony because he had not been notified that the State would call them as witnesses, and the prosecutor argued that they should be allowed to testify because he had only recently discovered their location. The trial court allowed Chalu to depose these witnesses after the end of the first day of trial, and they subsequently testified without cross-examination by Chalu. In the post-conviction hearing, Chalu stated that during deposition he found the Barlows to be hostile to Brown and stated, "I don't think they would have assisted me at all in any manner." On this record, we conclude that the strategic decision of Chalu not to cross-examine the Barlows or present their testimony during the penalty phase was well within the range of professional assistance. <u>See</u> <u>Strickland</u>, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

3.  Prescription Drugs

        Brown argues that Chalu was ineffective in failing to inform the
jury that Brown's inability to react during trial was caused by
antidepressant and antipsychotic medication administered at the
Hillsborough County Jail. Brown argues that counsel should have either
notified the jury of Brown's medicated state, requested that the
medication be stopped, or requested a medical reason for Brown's
involuntary medication.  Brown contends that information about this
medication was critical for the jury to consider in assessing whether
Brown could have formed sufficient specific intent to support his guilt or
premeditation and in deciding how to weigh potential mental health
mitigators when recommending Brown's sentence.  The record reflects
that Chalu testified in the post-conviction hearing that he and the
defense mental health experts knew that Brown was being
administered the drugs but that Chalu chose not to present this
information to the judge or jury during the guilt phase because he was
not presenting a mental health defense and Brown did not testify.  This
claim does not meet either prong of Strickland.

. . . .

6.  Diminished Capacity Defense

        Brown contends that Chalu was ineffective in that he failed to
present evidence of Brown's mental psychosis as well as sleep
deprivation, exhaustion, or intoxication at the time of the murder.
According to the trial record, Brown told police detectives that he was
not intoxicated on drugs or alcohol at the time of the murder and that he
had a clear memory of the murder and events surrounding it.  At the
evidentiary hearing, Chalu testified that he conferred at length with
Brown as to his mental state at the time of the murder and with mental
health experts who had examined Brown.  From these conversations
and reports, Chalu concluded that there was no evidentiary support for
an insanity defense or a lack of specific intent based on intoxication.
Thus, based on evidence in this record, we find that the performance of
Chalu as to this claim did not fall below the Strickland standard.

7.  Prejudice

        We agree with the circuit court that, even assuming that Chalu
was ineffective, Brown did not demonstrate prejudice.  Any defense
that Chalu chose to present would have been overshadowed by the
overwhelmingly inculpatory evidence at trial of Brown's confession to
police.  Not only did Chalu present a potentially viable defense within

the parameters dictated by the confession, he also prevented the jury from learning of evidence of a subsequent robbery and shooting allegedly committed by Brown and the State's theory of Brown's motive for this offense, which was Brown's desire to silence the seventeen-year-old victim, with whom he had had a sexual relationship.[n.12]  Although Chalu did not succeed in preventing a first-degree murder conviction, he did succeed in preventing  even more prejudicial evidence from reaching the jury.  On this record, we conclude that Brown has failed to establish a reasonable probability that, absent the claimed errors, the jury would have found him not guilty of first-degree murder.  Competent, substantial evidence supports the circuit court's factual findings.  Thus, we do not disturb those findings.  Based on our review of the record, we agree with the circuit court that Brown failed to demonstrate the required prejudice.

> [n.12]  The record indicates that Brown's age was 36 at the time of the murder.

The Florida supreme court also disposed of Brown's claim that counsel failed to object to the prosecutor's closing argument during the penalty phase.  Brown v. State, 755 So. 2d at 623-25:

Claim II.  Ineffective Assistance by Penalty-phase Counsel in Failing To Object to Closing Argument

In this subclaim of claim II, Brown contends that his penalty-phase counsel, Craig Alldredge, was prejudicially ineffective in that he failed to object to a portion of the penalty-phase closing argument by Assistant State Attorney Michael Benito that described positive aspects of life in prison in support of the prosecutor's argument against a life sentence.  In her order, the circuit judge held in respect to this claim:

> Evidence relating to [this claim] was presented by testimony of Wayne Chalu, . . . lead trial counsel for the defense, and Craig Alldredge, . . . penalty phase trial counsel for the defense.  The claim is essentially that trial counsel was ineffective for failing to object to the prosecutor's improper closing argument in the second phase . . . :
>
> > What about life imprisonment, ladies and gentlemen?  What about life

> imprisonment?  Now I am not saying that I
> would like to spend one day in jail, all right,
> don't get me wrong, but what about life
> imprisonment?  What can one do in prison?
> You can laugh; you can cry; you can eat; you
> can sleep; you can participate in sports; you
> can make friends; you can watch TV; you can
> read; in short, you live to learn -- you live to
> learn about the wonders that the future holds.
> In short, it is life.
>
> It is undisputed that counsel for the defense did not
> object.  Mr. Chalu was familiar with the prosecutor's use of
> this argument and was also aware that such argument had
> not been found to be improper at that time.  Mr. Alldredge
> testified that he was not aware that such argument was
> improper, that he would have objected had he known, and
> that he did not object.  Assuming without deciding that
> penalty phase counsel was deficient in his performance for
> failing to object to this portion of the prosecutor's
> argument, this Court cannot and does not find that the
> alleged deficient performance resulted in prejudice which
> meets the prejudice prong of Strickland v. Washington, 466
> U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), that is,
> a reasonable possibility that the outcome would have been
> different.

Order II at 2-3.  (citations omitted).

Based upon our review of the trial record, we agree with the
circuit court that Brown's claim in respect to this portion of the State's
argument fails to meet the prejudice prong of Strickland, as recently
reiterated by this Court in Jones v. State, 732 So. 2d 313 (Fla.
1999).[n.8]  The circuit court's ruling is consistent with this Court's
holding in Jackson v. State, 522 So. 2d 802, 809 (Fla. 1988), that a
similar unobjected-to argument would not be grounds for reversal for a
new penalty phase.  See also Hodges v. State, 595 So. 2d 929, 933
(Fla. 1992); Hudson v. State, 538 So. 2d 829, 832 n.6 (Fla. 1989).
Although we did find a similar claim as to the denial of an objection to
be harmful error in Taylor v. State, 583 So. 2d 323 (Fla. 1991), we did
so on the basis of harmless error record review.[n.9]  In sum, under the
circumstances of this case, we do not find that the failure to object to
this argument was conduct by counsel that deprived the defendant of a
trial whose result was reliable.

[n.8]  In <u>Jones</u>, we recognized that to prove
ineffective assistance of counsel, a defendant must show:
(1) that counsel made errors so serious that counsel was
not operating as the "counsel" guaranteed the defendant
by the Sixth Amendment; and (2) that such deficient
performance prejudiced the defense by depriving the
defendant of a trial whose result was reliable.  732 So. 2d
at 319 (quoting <u>Rutherford v. State</u>, 727 So. 2d 216, 219
(Fla. 1998) (quoting <u>Strickland</u>, 466 U.S. at 687)).  Unless
a defendant makes both showings, it cannot be said that
the conviction or death sentence resulted from a
breakdown in the adversary process that rendered the
result unreliable.  <u>Id.</u>

[n.9]  Brown's trial took place in 1987.  A year later,
in <u>Jackson</u>, this Court found that a nearly identical
argument by Benito was not misconduct so egregious that
it tainted the jury's recommendation.  522 So. 2d at 809.  In
<u>Hudson</u>, this Court found no reversible error in a similar
argument by Benito.  538 So. 2d at 832 n.6.  Four years
after Brown's trial, this Court remanded for resentencing in
<u>Taylor</u> after finding the trial court's allowing the same
argument by Benito to be harmful error.  583 So. 2d at 330.
However, subsequently, this Court found in <u>Hodges</u> that
allowing the same argument was harmless error.  595 So.
2d at 934.

Although we agree that Brown's claim fails to meet the prejudice
prong of <u>Strickland</u>, we also have reviewed the evidentiary record to
evaluate whether counsel's failure to object violates the first prong of
<u>Strickland</u>.  In this case, both defense counsel Wayne Chalu, who had
primary responsibility for the entire case, and defense counsel Craig
Alldredge, who handled the penalty phase, testified at the post-
conviction evidentiary hearing.  Chalu, who is now an assistant state
attorney in the Thirteenth Judicial Circuit, was at the time of this trial an
experienced felony litigator who had been an assistant public defender
in the Thirteenth Circuit for about eight years, had received special
training in handling capital cases, and had handled several prior capital
cases.  Chalu had overall responsibility for preparing and presenting
Brown's entire case.  Throughout the proceedings, Chalu worked
closely with Alldredge, who was assigned to handle the penalty phase.
At the time of the trial, Alldredge had been an assistant public defender
in the Thirteenth Circuit for about six years and had handled the guilt
phases of two other capital cases.  This was the first case in which

Alldredge had lead responsibility for the penalty phase. Alldredge subsequently became an assistant federal public defender.

In the evidentiary hearing below, Chalu described his working relationship with Alldredge during this case as follows:

> [W]e talked to each other constantly. We're in the same office. We're just a few feet away from each other, and we talked about the case probably daily. . . . [B]asically, I was working on the guilt phase and [Alldredge] was working on the penalty phase. Of course . . . we both pretty much knew what the other was doing in terms of preparation because we talked about it all the time.

Chalu testified that at time of the trial he understood that no case law had found reversible error in a court's allowing the challenged penalty-phase closing argument. Chalu further testified:

> I personally don't think it was so bad. I think we capitalized on it, too. Mr. Alldredge sort of capitalized on that. In their closing, it seemed closest to me innuendo if you're alive, you can do these things; if you are not, you can't. I didn't think it was that prejudicial.

Alldredge testified at the evidentiary hearing that he saw no reason to object during the prosecutor's presentation of the now-challenged portion of the closing argument because he did not consider the argument to be improper. The trial record reflects that Alldredge, in arguing for a life sentence, presented in penalty-phase closing argument a grim description of life in prison in order to counter the prosecutor's positive characterization of life in prison. Alldredge answered the prosecutor's argument by describing prison life in these contrasting terms:

> Mr. Benito tells you life in prison ain't that bad. The number one cause of death in [the] Florida State Prison system is suicide, so if it ain't that bad, there are a lot of men who are obviously making terrible mistakes.
>
> It's a world of reinforced concrete, and steel, and steel doors, and coils of razor wire, and electric fences, and machine guns, and shotguns. Mr. Benito says he'll make friends and be able to enjoy sports. He will spend

the rest of his life with men who society has found their presence so abhorred that they have to be locked away.

Paul Brown will most likely get out of prison when he dies. . . .

He is going to die. We all have to die. His life has been garbage. If he spends the rest of his life in prison, the rest of his life is going to be garbage, too, but it will be life.

. . . .

. . . If Judge Spicola sentences him to life in prison, he will spend life in prison. He's not going to harm another innocent person, again.

We find that defense counsel's failure to object does not fall below the standard of constitutionally effective counsel as provided in Strickland. Moreover, we find no basis in the evidence to reject trial counsel's opinion that Alldredge capitalized upon the complained-of closing argument in presenting his own argument for a sentence of life in prison.[n.10] Accordingly, we find no merit in Brown's claim that trial counsel was ineffective in failing to object to the prosecutor's penalty-phase closing argument.

[n.10] See Sims v. Singletary, 155 F.3d 1297, 1306-07 (11th Cir. 1998); Davis v. Singletary, 119 F.3d 1471, 1477 (11th Cir. 1977); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994), in which the federal courts held that counsel's decisions as to trial strategy and tactics were within the bounds of reasonably competent representation.

The Florida supreme court also considered the testimony of Dr. Dee and Dr. Faye Sultan in its analysis of the claim of ineffective assistance of counsel at the penalty phase. See Brown, 755 So. 2d at 631-37. Although Brown may be dissatisfied with the result announced by the state courts, he fails to establish, as required by AEDPA, that the state courts' determination was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. The

Florida supreme court analyzed Brown's claims and applied the correct legal standard prescribed in Strickland.

Ground three warrants no habeas corpus relief.

## Ground Four

Ineffective assistance of counsel at penalty phase and the prosecutor's improper conduct and argument rendered defendant's conviction and resulting death sentence fundamentally unfair and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

## Brown's Alleged Facts in Support of Ground Four

Brown claims that Prosecutor Benito urged jurors to sentence Brown to death on the basis of numerous impermissible and improper factors. Brown contends trial counsel was ineffective for failing to object to the prosecutor's allegedly improper closing argument.

What about life imprisonment, ladies and gentlemen? What about life imprisonment? Now I am not saying that I would like to spend one day in jail, all right, don't get me wrong, but what about life imprisonment? What can one do in prison? You can laugh; you can cry; you can eat; you can sleep; you can participate in sports; you can make friends; you can watch TV; you can read; in short, you live to learn -- you live to learn about the wonders that the future holds. In short, it is life.

People want to live. Life imprisonment is life. If Pauline Cowell, if she had it, she would have given Paul Brown the world if he would have just let her live. People want to live.

Life imprisonment is life, but Pauline Cowell is dead, and she is dead for one reason. She is dead because Paul Alfred Brown decided for himself, that she should die. That man, right there, made that decision, for making that decision -- for making that decision he also deserves to die.

The punishment must fit the crime.

If it wasn't for Paul Alfred Brown, ladies and gentlemen, Pauline Cowell, 17 years old, would have almost her entire life ahead of her. She was 17, but Pauline Cowell is no more. On this earth for 17 years and now she is gone. (R. 636-37)

Brown claims that the prosecutor's telling the jury that Brown should be shown the "same mercy" that Brown had shown the victim was improper. Brown also alleges that, even though the evidence demonstrated that Pauline Cowell's murder was triggered by her screaming and was not "in an execution manner," the prosecutor improperly argued:

Pauline Cowell was not simply killed, all right. She wasn't simply killed, Pauline Cowell was executed. She was executed. (R 634-35)

Brown contends that the prosecutor argued that the system of justice would not "function properly" unless Brown received a death sentence. (R. 635)

In the amended petition (Doc. 59 at pp. 34-35), Brown also contends:

Trial counsel Alldredge was responsible of [sic] handling the penalty phase of Mr. Brown's case and making the appropriate objections. At Brown's evidentiary hearing he admitted knowing that Benito would make this argument, testified that he did not object and offered no strategic reason for his failure to do so. (PC-R, Vol. V, 151) Mr. Benito's argument was meant to evoke an emotional response from the jury. Trial counsel's failure to object is not reasonable. There should be no question that the argument was improper as the Florida Supreme Court later ruled this exact argument objectionable. It is significant to note that the substance of Benito's argument had already been found improper and objectionable prior to Brown's jury trial. Counsel's failure to object prevented Mr. Brown from preserving a viable issue at direct appeal and was ineffective assistance of counsel. In the context of a 7 to 5 vote for death, Brown suffered prejudice as the jury decided his fate on factors that were clearly outside the scope of deliberations. Contrary to the State court's holding, Brown met the prejudice prong enunciated by the U.S. Supreme Court in Strickland v. Washington, establishing a probability sufficient to undermine confidence in the outcome. Federal Habeas relief is warranted.

The State contends that ground four is exhausted.  However, ground four is only partially exhausted because the present federal petition for the writ of habeas corpus raises new claims not raised in state court.  Specifically, in his amended Rule 3.850 motion for post-conviction relief (Exhibit Q-2, R 158-59), Brown argued only that:

> 4. During Mr. Benito's impassioned closing argument, he urged the jurors to sentence Mr. Brown to death on the basis of numerous impermissible and improper factors including the [now] infamous argument:

> What about life imprisonment, ladies and gentlemen?  What about life imprisonment?  Now I am not saying that I would like to spend one day in jail, all right, don't get me wrong, but t [sic] what about life imprisonment?  What can one do in prison?  You can laugh; you can cry; you can eat; you can sleep; you can participate in sports; you can make friends; you can watch TV; you can read; in short, you live to learn -- you live to learn about the wonders that the future holds.  In short, it is life.

> People want to live.  Life imprisonment is life.  If Pauline Cowell, if she had it, she would have given Paul Brown the world if he would have just let her live.  People want to live.

Nowhere in his amended Rule 3.850 motion did Brown include the claim that Prosecutor Benito argued either 1) "the punishment must fit the crime" or 2) "Pauline Cowell was not simply killed, all right.  She wasn't simply killed.  Pauline Cowell was executed.  She was executed" or 3) the system of justice would not "function properly" unless Brown received a death sentence.  These new claims were not raised at the state evidentiary hearing and were not discussed in the Florida supreme court's order affirming the trial court's denial of Rule 3.850 relief.  Therefore, these specific claims of improper prosecutorial argument are unexhausted and procedurally barred.  Brown fails to show cause and prejudice to

overcome the procedural bar and fails to show that manifest injustice results if these new claims remain unaddressed.

The Florida supreme court affirmed the post-conviction court's denial of Brown's remaining claim that attorney Alldredge was ineffective for failing to object to the "day in the life of a prisoner" argument. Brown fails to establish, as required by AEDPA, that the state courts' determination was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. The Florida supreme court analyzed and applied the correct legal standard prescribed in Strickland v. Washington, 486 U.S. 668 (1984).

Ground four warrants no habeas corpus relief.

## Ground Five

Mr. Brown was deprived his right to a reliable adversarial testing and effective assistance of counsel and mental health experts at the penalty phase of his capital trial, when the necessary background information was not obtained and the State failed to turn over material information which would have led counsel to discover substantial mitigating evidence, all in violation of [Brown's] rights to due process and equal protection under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

## Brown's Alleged Factual Basis for Ground Five

Due to a lack of independent corroboration, the defense was unable to establish at trial Brown's lifelong history of mental disability. At the evidentiary hearing, Dr. Sultan testified that Brown is not a malingerer, and Dr. Dee testified that Brown suffers organic brain damage among other mental disturbances.

Penalty phase counsel Alldredge testified that he was dissatisfied with the caliber of the work of investigator Webb and testified that Alldredge would not use

investigator Webb in the future. Alldredge testified that Webb was unable to locate school records, a complete Department of Corrections file, records of prior offenses, records of Dr. Fleischaker, or report cards in the possession of Brown's family. Alldredge testified that these records were important to corroborate the mental health experts' testimony.

Alldredge testified that obtaining these records became Alldredge's responsibility when Webb failed to obtain them and that, had Alldredge obtained the records, he would have presented them to Brown's jury. Alldredge stated that neither tactics nor strategy explained the failure to obtain these records.

Brown claims that during the penalty phase both mental health experts lacked background information to provide a complete mental health evaluation. Dr. Berland believed that severe psychosis was present but lacked the background information necessary to resolve the confusion surrounding the MMPI result or to find statutory mitigation. Dr. Afield believed Brown was schizophrenic but lacked the background information needed to corroborate his opinion.

The records that Alldredge failed to obtain and failed to provide to mental health experts included the requisite proof that Brown was neither malingering nor exaggerating symptoms arising from chronic psychological problems present since early childhood. The school records introduced in the post-conviction proceedings described Paul Brown in the fourth grade as "an extremely nervous child. He bangs his head on the desk, makes noises imitating a moving train, crawls on the floor, lies on benches and tables in the rear of the classroom, wanders around aimlessly picking up books, plants, chalk, etc., occasionally speaks to inanimate objects and

sits facing [an] open window for long periods of time pulling and playing with a venetian blind cord and speaking to himself."

In 1965, Dr. Jerry J. Fleischaker, Director of the Guidance Center of Hillsborough County, described fifteen-year-old Paul Brown as a "psychotic boy." The prognosis for Brown was very poor, and Dr. Fleischaker noted that Brown might eventually require hospitalization and that medication "should be attempted."

Brown contends that, although Dr. Berland opined at the penalty phase of the trial that the statutory mental health mitigators probably applied, Berland testified that he lacked "enough information to really give you -- give that. I think there is a probability that he was, but I can't verify it to my satisfaction." (R 566) The additional background information would have bolstered the credibility of Drs. Berland and Afield before the trial court.

Due to the lack of information, Dr. Berland struggled to characterize Brown's "mental or emotional disturbance [as] extreme" and struggled to find substantial impairments, and Dr. Afield lacked this information to corroborate his opinion. Consequently, Brown claims, statutory mitigators available to Brown under Section 921.141(6)(b)(f) were not given great weight by the sentencing judge. (R 914)

<u>Ground Five Lacks Merit</u>

To the extent Brown contends that trial counsel rendered ineffective assistance of counsel at the penalty phase, the claim was properly rejected by the post-conviction court after an evidentiary hearing, as explained in <u>Brown v. State</u>, 755 So. 2d at 631-37, affirming the denial of relief:

Claim IV. Penalty-phase Ineffective Assistance of Counsel

## A. Introduction

Brown contends in his fourth claim in this appeal that he was denied effective assistance of counsel during the penalty phase of his trial. Brown bases this claim upon the following allegations: (1) counsel failed to perform an adequate investigation in order to obtain necessary background information for mitigation; (2) counsel conceded aggravating circumstances without notice to Brown; (3) counsel failed to object to an improper closing argument; and (4) counsel failed to inform the jury that Brown's courtroom demeanor was affected by antidepressant and antipsychotic prescription drugs administered at the Hillsborough County Jail or, alternatively, to request that the medication be terminated. In our review of this claim, we have considered the trial record, the record of the post-conviction evidentiary hearing, and the circuit court's post-conviction order.

## B. Trial Record

The trial record reflects the following. At the request of defense counsel, the trial court appointed Dr. Robert Berland and Dr. Walter Afield to evaluate Brown's mental state for purposes of the guilt phase and then to help in developing evidence of statutory and nonstatutory mitigation for the penalty phase. Dr. Berland is a clinical psychologist specializing in forensic psychology who had been licensed to practice psychology for ten years at the time of the trial. He had worked for eight years with criminally committed mentally ill patients at Florida State Hospital at Chattahoochee, and at the time of the trial in 1987, he was engaged in private practice performing court-ordered evaluations of criminal defendants. At the time of the trial, Dr. Afield had been a physician specializing in psychiatry for twenty-six years. Dr. Afield was board certified in adult psychiatry, child psychiatry, and mental health administration and had previously served on the medical school faculties at Harvard University, Johns Hopkins University, and the University of South Florida. At the time of the trial, he had been engaged in the private practice of psychiatry for twelve years.

Dr. Berland testified during the penalty phase that, in preparing to make an evaluation as to Brown's mental and emotional status, he reviewed Brown's jail medical records, police reports, and depositions related to this case. He also reviewed a 1980 psychological profile and administered several standardized psychological tests, including an intelligence test, to Brown. Dr. Berland interviewed Brown on at least five separate occasions. Based on these interviews, his test results,

and his review of the relevant documents, Dr. Berland testified during the penalty phase that he found Brown to be operating mentally below normal with an IQ of 81. Dr. Berland concluded that Brown had organic brain damage and opined that Brown was psychotic and probably was suffering from bipolar disorder. Dr. Berland stated that he believed Brown was under the influence of a mental or emotional disturbance but that he could not say whether the disturbance was extreme at the time of the crime. Dr. Berland opined that Brown's capacity to appreciate the criminality of his conduct was not impaired but that his capacity to conform his conduct to the requirements of the law was impaired, although not substantially impaired, at the time of the crime. He testified that the impairment resulted from interaction between Brown's low intelligence and his psychotic disturbance, which had the effect of increasing his impulsiveness and diminishing his ability to make sound judgments. Dr. Berland also stated that his test results indicated that Brown did not have tendencies toward being a "cold-blooded" killer.

Defense counsel also presented during the penalty phase the testimony of Dr. Afield, who testified that he reviewed jail records and Dr. Berland's test results and interviewed Brown once. During this interview, Brown told Afield he was abused as a child, married at age sixteen, had been knocked unconscious in several accidents, and lived a marginal existence as a junk man and "street person." Based on this history and his review of the records, Afield opined that Brown was mentally retarded, suffered from organic brain damage, and was psychotic. He further testified that he believed that, although Brown had an antisocial personality disorder, he knew right from wrong. In contrast to Dr. Berland, Afield opined that Brown's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the murder.

Defense counsel also presented during the penalty phase as lay witnesses Brown's father, his stepmother, and his brother, who testified as to Brown's childhood. Brown's father testified that he did not live with Brown and his mother when Brown was a child. He stated that juvenile authorities removed Brown from his mother's custody when he was five or six years old because the family was living in "pure filth." Brown and his brother went to live on a farm in the custody of their great aunt, who beat Brown with wet rags and corn shucks. Three years later, Brown began living with his father and stepmother in Tampa, where he attended school. Brown's father testified at trial that his son was not a good student but that he did not get into trouble in school. As an adult, Brown fathered and supported children, helped his neighbors, and held jobs, including his most recent occupation of

collecting cans for recycling. Brown's stepmother, Wanda Brown, testified that Paul was "always sweet" and that he was a slow learner. Brown's brother, Jimmy Lee Brown, testified that Brown was beaten as a child and was a slow learner who helped others and was never violent.

### C. Post-conviction Evidentiary Hearing Record

The record of the post-conviction evidentiary hearing before the circuit court reflects the following. With the assistance of Chalu, defense counsel Alldredge represented Brown during the penalty phase. We have previously set forth the relevant legal experience of Chalu and Alldredge. Chalu testified that he was initially appointed to handle Brown's case, and about three months before the trial, Alldredge was appointed solely to handle the penalty phase. Both Chalu and Alldredge worked with the investigator who was assigned to assist them. Immediately after his appointment to Brown's case, Chalu hired Dr. Berland and later Dr. Afield to assess Brown's mental status for purposes of planning both the guilt and penalty-phase defense strategies. After Alldredge became involved in the case, both Chalu and Alldredge helped Dr. Berland and Dr. Afield with data collection, including retrieval of reports as to Brown's prior psychological testing. When these mental health experts informed Chalu and Alldredge that no mental health defense was available for the guilt phase, Alldredge began working with the experts in preparing for the penalty phase. Chalu testified that he, Alldredge, and Dr. Berland interviewed family and friends of Brown in preparation for the penalty phase. Chalu testified that, by the time the trial began, he believed he and Alldredge and their investigator and experts had gathered "pretty much all the data that was available to us" concerning Brown's history.

Alldredge testified that after he was assigned to Brown's case, he first read the depositions and discussed the case with Chalu and Drs. Berland and Afield. He then met with Brown and interviewed the penalty-phase witnesses. He requested that his investigator retrieve "[e]verything and anything" as to Brown's childhood, his past criminal records, any prior mental health evaluations, and school records. Alldredge testified that finding information as to Brown's history and locating witnesses was particularly difficult and that he was not satisfied with the level of investigation provided for the penalty phase. Alldredge testified that he did not recall reviewing any of Brown's school records but that such records could have been useful during the penalty phase. Upon cross-examination, Alldredge conceded that Brown had begun school sometime after age six and had dropped out at age fourteen so that the extent of his school records would have been limited.

Alldredge also testified that Dr. Berland, the most thoroughly prepared forensic psychologist he knew, did not indicate the need for further data in order to render his opinion of Brown's mental status. Alldredge testified that he did not request further neurological testing to confirm organic brain damage.[n.13]

> [n.13] Dr. Berland testified in the post-conviction hearing that he did not recommend a CAT scan for Brown because this neurological test was imprecise in measuring organic brain damage and, if the test showed no brain damage, that result could be used against Brown at trial. Dr. Berland testified that a PET scan was not recommended because, at the time of Brown's trial in 1987, the test was not available in Hillsborough County, and furthermore, no research data existed at the time as to how to interpret the test. Dr. Berland testified that the PET scan was not widely accepted until recently and still is not approved by the Food and Drug Administration as a medical diagnostic tool.

During the post-conviction evidentiary hearing, Brown also presented the testimony of Dr. Szabo, the psychiatrist who evaluated Brown in the Hillsborough County Jail where Brown was awaiting trial in March 1986; Dr. Henry L. Dee, a psychologist who evaluated Brown in 1992 as part of an earlier post-conviction effort; Dr. Jerry J. Fleischaker, a psychiatrist who evaluated Brown at a child guidance clinic in Tampa when Brown was a teenager; Dr. Fay Ellen Sultan, a clinical psychologist who evaluated Brown's mental status in 1996 for post-conviction evidentiary purposes; and Dr. Berland, one of the two mental health experts who had testified at Brown's penalty phase.

Dr. Szabo testified that he diagnosed Brown as having schizophrenia, a form of psychosis, and prescribed Mellaril, an antipsychotic drug, to prevent Brown from deteriorating into a state in which he might harm others or himself while incarcerated at the jail. Dr. Fleischaker testified that he performed a psychiatric evaluation on Brown at the request of a court when Brown was about fifteen years of age, but Dr. Fleischaker did not testify as to the contents of the report. Dr. Dee testified as to his conclusion that, consistent with the opinions of Drs. Berland and Afield, Brown suffered organic brain syndrome and a longstanding major emotional disturbance manifested as schizophrenia. Dr. Sultan testified that she interviewed Brown as well as his father, stepmother, brother, and Dr. Dee, and reviewed the historical records as to Brown that were not available to Dr. Berland at the time of the trial. Dr. Sultan concluded that Brown was operating

under severe and extreme psychiatric and organic mental conditions at the time of the murder.  Dr. Berland testified that Brown was probably exaggerating but not malingering during his conversations with the psychologist and in his answers to test questions.  Dr. Berland testified that nothing in Dr. Dee's report or Brown's 1967 presentence investigation report, neither of which were in his possession at the time of the trial, convinced him to change his findings as to Brown.  Dr. Berland stated that he would not have presented the 1967 presentence investigation report to the jury because it would have documented Brown's history as a sex offender.  Dr. Berland testified that access to additional collateral information would not have changed his opinion at trial that Brown was disturbed but not under extreme emotional disturbance at the time of the murder.  Dr. Berland testified that additional historical information such as school records showing that Brown was a nervous child who beat his head against a table would have been helpful in conveying to the jury the nature of Brown's psychosis for purposes of the jury's weighing process during the penalty phase.

Brown also presented during the post-conviction hearing the testimony of Bessie Conway, who was related by marriage to Brown and lived next door to him when he was a child in Tampa; Daniel Jackson, Brown's stepbrother; and Jimmy Lee Brown, Brown's brother. Conway testified that Brown's father once beat him with a belt. Jackson testified that Brown's father often beat Brown as well as his brother, stepbrother, sister, and mother.  Jackson testified that he was contacted by an investigator prior to Brown's trial and told the investigator of the beatings and that, as a child, Brown was accused of "messing with other little kids in the neighborhood."  Jackson stated that the investigator said he was not interested in finding out what Jackson meant by "messing around" and that he was not interested in pursuing Jackson as a witness. Jackson also stated that Brown's stepmother cooked for the children, helped them with their homework, and saw that they went to school.  Jimmy Lee Brown testified, as he did at trial, that all the children in the family were abused.  He testified that Paul Brown was beaten by his father, babysitters, relatives, and other children in the children's homes where the Brown children stayed when Brown's father was out driving a truck and his stepmother was incapacitated with a nervous breakdown.

After considering this evidence and argument based on this evidence, the circuit court denied Brown the relief he requested in his penalty-phase ineffective assistance claims, concluding that Brown failed to meet the prejudice prong of the <u>Strickland</u> test.  The circuit court order states in relevant part:

Most of the evidence presented addressed this [ineffective assistance] issue, but it boils down to defense counsel failing to discover an earlier "presentence investigation report," and some school records. While Mr. Alldredge expressed dissatisfaction with the level of investigation provided by his office, the records eventually located by the Defendant did not in any way change the opinion of the mental health experts and the opinion of the defense's mental health experts at the evidentiary hearing did not differ from the opinions offered at trial. The essence of the Defendant's allegation seems to be that the experts' opinions would have been given greater weight if they had additional records upon which to base their opinions at trial, but the psychologist who testified at the hearing stated that although the additional information might have been helpful, his opinion was unchanged. Counsel for the defense further claims that penalty phase counsel was ineffective for failing to call as lay witnesses family members and friends to testify concerning the Defendant's abuse as a child and low intelligence, but, in fact, two family members did testify to neglect and abuse and low intelligence. . . .

No reasonable probability has been shown that but for deficient performance by counsel at the guilt or penalty phase, the result would have differed.

Order II at 4-5.

### D. Discussion of Brown's Claims

#### 1. Penalty Phase Investigation

As we have delineated in reviewing Brown's claims of ineffective assistance of counsel in the penalty phase of his trial, we have reviewed the trial record and the record of the post-conviction evidentiary hearing. We recognize, as we did in our discussion of the guilt-phase claims, that under <u>Strickland</u> we must presume that counsel provided reasonable professional assistance and that Brown bears the burden of proving that such representation was unreasonable. 466 U.S. at 688-89, 104 S. Ct. 2052. Similar to <u>Jones v. State</u>, 732 So. 2d 313 (Fla.1999), this is not a case in which trial counsel engaged in no investigation at all. The issue here is whether the investigation into mitigating circumstances undertaken by Chalu and Alldredge was so unreasonable that defense counsel "was not functioning as the

'counsel' guaranteed by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. 2052.

Brown contends in this appeal that counsel failed to provide Brown's mental health experts with a 1967 presentence investigation report and other background materials such as school records, juvenile records, or family background. Brown argues that such collateral data would have helped to refute the State's focus on Dr. Berland's statement that Brown seemed to be malingering or faking his psychiatric symptoms during interviews with the mental health experts. Actually, however, Dr. Berland only testified at trial that in his opinion Brown was exaggerating. In the post-conviction hearing, he stated that he took this tendency into account when drawing his conclusions as to Brown's true mental state.

Brown also argues that the trial judge's failure to find statutory mental mitigators was due to conflicting and insubstantial penalty-phase testimony from Drs. Berland and Afield as to Brown's mental state at the time of the murder. However, both experts arrived at essentially the same conclusion: Brown was suffering from organic brain damage and psychosis, manifested as paranoia or schizophrenia. Dr. Berland testified at the post-conviction hearing that he had interviewed Brown in 1986 prior to his trial and had testified in Brown's penalty phase that Brown was psychotic. Also at the post-conviction hearing, Dr. Berland testified that, if he had been able to review Brown's presentence investigation report and his school records before Brown's trial, "all that information would have done was to corroborate what I had already concluded, that he was psychotic."

Brown also argues ineffectiveness in that counsel did not call as lay witnesses additional family members and friends to testify concerning Brown's abuse as a child and his low intelligence. Upon their appointment to represent Brown, Chalu and Alldredge began inquiring into Brown's family history and mental state at the time of the murder. The investigator assigned to their case contacted various relatives and acquaintances of Brown. Alldredge testified that it was difficult to find and secure them as witnesses partly because the investigator assigned to Brown's case was not as aggressive as Alldredge would have preferred in uncovering Brown's history. However, Alldredge also testified that, based on conversations with potential witnesses, he made a strategic decision not to call certain lay witnesses because their testimony as to Brown's history, which included other convictions and a history as a sex offender, would have produced aggravating rather than mitigating factors. Alldredge determined that he had sufficient evidence of Brown's background even

without the school records and presentencing investigation report. In view of the fact that Dr. Berland stated at the post-conviction evidentiary hearing that such collateral data would not have changed his testimony, we conclude that the performance of Brown's penalty-phase counsel did not fall below the <u>Strickland</u> standard. <u>See Mills v. Singletary</u>, 63 F.3d 999, 1023-26 (11th Cir. 1995).

Brown fails to show, as AEDPA requires, that the state court ruling is contrary to, or an unreasonable application of, Supreme Court law.

<u>Ake v. Oklahoma</u>

If Brown contends that the trial court violated his right to due process by failing to provide a psychiatrist upon Brown's request, as required in <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), the claim lacks merit.

<u>Ake</u> holds that if the defendant's sanity at the time of the offense significantly affects the trial, the defendant enjoys a due process right to the assistance of a psychiatrist in preparing an effective defense. <u>Duren v. Hopper</u>, 161 F.3d 655, 664 (11th Cir. 1998). If the trial court had denied Brown's request for psychiatric assistance, Brown could have raised an <u>Ake</u> claim on direct appeal. Brown's failure to raise an <u>Ake</u> claim on direct appeal precludes his collateral challenge on that issue in this habeas corpus petition.

Further, the claim is frivolous that the trial court denied the defense the opportunity to utilize a mental health expert at the penalty phase. As the Florida supreme court stated in <u>Brown v. State</u>, 755 So. 2d at 631-32:

> The trial record reflects the following. At the request of defense counsel, the trial court appointed Dr. Robert Berland and Dr. Walter Afield to evaluate Brown's mental state for purposes of the guilt phase and then to help in developing evidence of statutory and nonstatutory mitigation for the penalty phase. Dr. Berland is a clinical psychologist specializing in forensic psychology who had been licensed to practice

psychology for ten years at the time of the trial. He had worked for eight years with criminally committed mentally ill patients at Florida State Hospital in Chattahoochee, and at the time of the trial in 1987, he was engaged in private practice performing court-ordered evaluations of criminal defendants. At the time of the trial, Dr. Afield had been a physician specializing in psychiatry for twenty-six years. Dr. Afield was board certified in adult psychiatry, child psychiatry, and mental health administration and had previously served on the medical school faculties at Harvard University, Johns Hopkins University, and the University of South Florida. At the time of trial, he had been engaged in the private practice of psychiatry for twelve years.

No Ake violation occurred. See Provenzano v. Singletary, 148 F.3d 1327, 1333-34 (11th Cir. 1998). Consequently, Brown is not entitled to habeas corpus relief on the claim that—because the necessary background information was not obtained and because the State failed to disclose information essential to the discovery of substantial mitigation evidence—he was deprived of his right to (1) a reliable adversarial testing, (2) effective assistance of counsel, and (3) a mental health expert at the penalty phase of his capital trial.

Ground five warrants no habeas corpus relief.

### Ground Six

The prosecutor's inflammatory and improper comments and argument, the introduction of non-statutory aggravating factors, and the sentencing court's reliance on these non-statutory aggravating factors rendered [Brown's] conviction and resulting death sentence fundamentally unfair and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

### Brown's Allegations in Support of Ground Six

The objectionable comments and arguments by Prosecutor Benito are detailed in ground four above. During the penalty phase, Brown presented witnesses whose testimony probed statutory and non-statutory mitigation. The

State presented no witnesses at the penalty phase of the trial. Drs. Berland and Afield testified for Brown regarding Brown's mental illness, psychotic behavior, and brain damage. Family members testified that Brown suffered severe learning disabilities and consequent "retardation," that Brown was characteristically non-violent, that at the time of the offense Brown was under great economic pressure to support his children, and that Brown had not slept in two to three days before the murder. (R 522-97)

Acknowledging that some evidence of mitigation had been presented but affording little or no weight to the mitigation, the trial judge concluded that the mitigation "did not outweigh any <u>one</u> of the three aggravating circumstances." Brown contends that the judge's conclusion is sustainable only if the prosecutor's improper arguments were accepted by the trial court as non-statutory aggravating evidence to tip the scale in favor of death. Consequently, Brown claims he was denied an individualized sentencing.

<u>Ground Six Lacks Merit</u>

Brown acknowledges that he failed to raise ground six on direct appeal but asserts that he raised ground six in his state post-conviction motion. In claim two of the Rule 3.850 motion for post-conviction relief, Brown asserts improper prosecutorial comment and argument and the introduction of non-statutory aggravators. The post-conviction court found that claim procedurally barred because Brown could have raised the issue on direct appeal. <u>See</u> <u>Brown v. State,</u> 755 So. 2d at 619-20 nn.1 and 2. On his appeal from the post-conviction court's adverse ruling, Brown did not include this issue among the fourteen issues he

presented to the Florida supreme court.  See Brown, 755 So. 2d at 621 n.5.

Brown's failure to present this issue to the Florida supreme court constitutes an

additional procedural default.  Brown's failure to raise the claim on appeal of the

denial of the Rule 3.850 motion constitutes an abandonment and precludes

presentation of the claim in Brown's habeas corpus petition unless Brown shows

cause and prejudice, which he has not shown.  See also Atkins v. Singletary, 965

F.2d 952, 955 n.1 (11th Cir. 1992); Doyle v. Dugger, 922 F.2d 646, 649-50 n.1 (11th

Cir. 1991).

     Furthermore, to the extent Brown raises the substantive claim of improper

prosecutorial comment and argument, the claim is procedurally barred because this

claim must be raised on direct appeal and not raised initially in a collateral

challenge.  As the Florida supreme court stated in  Brown v. State, 755 So. 2d at

621 n.7:

> The following claims in this Court are procedurally barred because they
> either were or should have been presented on direct appeal:  claims VI
> through IX, claims XI through XIV, and the portion of Claim II that
> challenges the prosecutor's penalty phase closing argument.  See
> Urbin v. State, 714 So. 2d 411, 418 n.8 (Fla. 1998).

> Failing to object timely to improper prosecutorial comment forecloses the

issue on direct appeal.

> The State correctly points out that because there was no
> contemporaneous objection to the prosecutor's argument, this issue
> should be procedurally barred.  We have long held that allegedly
> improper[ ] prosecutorial comments are not cognizable on appeal
> absent a contemporaneous objection.  See Kilgore v. State, 688 So. 2d
> 895, 898 (Fla. 1996), cert. denied, ___ U.S. ___,  118 S. Ct. 103, 139
> L. Ed. 2d 58 (1997); Gibson v. State, 351 So. 2d 948, 950 (Fla. 1977);
> State v. Jones, 204 So. 2d 515 (Fla. 1967).  The only exception to this
> blanket procedural bar is where the comments constitute fundamental

> error, defined as error that "reaches down into the validity of the trial
> itself to the extent that a verdict of guilty could not have been obtained
> without the assistance of the alleged error." Kilgore, 688 So. 2d at 898.
> Urbin's appellate counsel suggested at oral argument that the lack of
> objection to the numerous instances of clear misconduct revealed the
> quality of defense representation at trial. We tend to agree on this
> record, especially as to defense counsel's extremely brief and
> unfocused penalty-phase closing argument. Indeed, defense counsel
> opened his argument by assuring the jury that, "I'll try and keep what
> [the prosecutor] may not have covered in my argument within ten
> minutes." In that goal, defense counsel succeeded, proudly closing his
> abbreviated remarks by stating, "I did it in ten minutes."

Urbin v. State, 714 So. 2d 411, 418 n.8 (Fla. 1998). See also "Order Denying in

Part Amended Motion to Vacate Judgment and Sentence with Special Request for

Leave to Amend" dated November 12, 1996. (Exhibit Q3, pp. 298-306) The

prosecutor neither introduced nor relied on a non-statutory aggravating factor and

the sentencing court relied on no improper, non-statutory aggravating factor.

Brown fails to demonstrate cause and prejudice to overcome the procedural

default of ground six. See Wainwright v. Sykes, 433 U.S. 72 (1997). Finally, Brown

fails to demonstrate that the state court decisions are contrary to, or an

unreasonable application of, Supreme Court law.

Ground six warrants no habeas corpus relief.

<u>Ground Seven</u>

Paul Brown's Eighth Amendment right against cruel and unusual
punishment will be violated as Mr. Brown may be incompetent at the
time of execution.

In accordance with Florida Rules of Criminal Procedure 3.811 and 3.812,

enacted in response to Ford v. Wainwright, 477 U.S. 399 (1986), a prisoner may not

be executed if "the person lacks the mental capacity to understand the fact of the

impending death and the reason for it."  Brown acknowledges a death warrant must

be signed by the Governor of Florida before he can raise ground seven in any court.

Brown raised ground seven in state court and in his amended federal petition to

preserve the claim for later review.

Ground Seven Is Premature

Brown raised this claim in his state habeas corpus petition, and the Florida

supreme court agreed with his concession that the claim was not ripe.  Brown v.

Moore, 800 So. 2d 223, 224 (Fla. 2001), states:

> Brown first argues that he may be incompetent to be executed.  Brown
> agrees that this claim is premature under Florida Rule of Criminal
> Procedure 3.811.  However, Brown asserts that he makes the
> argument to preserve his ability to pursue a similar claim in the federal
> system on account of In re Provenzano, 215 F.3d 1233, 1235 (11th
> Cir.), cert. denied, 530 U.S. 1256, 120 S. Ct. 2710, 147 L.Ed.2d 979
> (2000).  We agree with his concession that this issue is not yet ripe,
> and we therefore find it to be without merit.  See Hall v. Moore, 792
> So. 2d 447, 450 (Fla. 2001); Mann v. Moore,794 So. 2d 595, 2001 Fla.
> LEXIS 1405, 26 Fla. L. Weekly S490, S491 (Fla. July 12, 2001).

This claim remains premature and unripe at this time, because the Governor

has not signed a death warrant; however, the claim is otherwise currently

exhausted.

Ground seven warrants no habeas corpus relief.

Ground Eight

The Florida Death Penalty Statute is unconstitutional as applied under
the Fifth, Sixth, Eighth and Fourteenth Amendments to the United
States Constitution.  Appellate counsel was ineffective for failing to
raise this error on appeal and the appellate court's ruling denying Mr.
Brown's claim resulted in a decision that was contrary to, or involved an
unreasonable application of clearly established Federal law.

Brown incorrectly contends that he raised this ground in a state petition for writ of habeas corpus.  His claim in the state petition for writ of habeas corpus reads:

> The Florida Death Sentencing Statute as Applied Is Unconstitutional Under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Corresponding Provisions of the Florida Constitution.

(Respondent's Exhibit X; Petition for Writ of Habeas Corpus, p. 7)  Brown cited Jones v. United States, 526 U.S. 227 (1999), and Apprendi v. New Jersey, 530 U.S. 466 (2000).  Although Brown's state petition for the writ of habeas corpus neither cites Strickland v. Washington nor raises appellate counsel's ineffectiveness, the Florida supreme court read his petition to include a claim of ineffective assistance of appellate counsel:

> Brown's second argument is that the death sentence in his case is unconstitutional as applied to him in light of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000).  He argues that at the time of his penalty phase, section 775.082(1), Florida Statutes (1983), provided the maximum sentence was life in prison without the possibility of parole for twenty-five years.[n.1]  Brown further argues that the aggravating circumstances were required to be charged in the indictment, submitted to the jury during the guilt phase, and found by the jury in a unanimous verdict.  Brown claims that his appellate counsel was ineffective for not raising these issues.
>
> [n.1]  The murder occurred in 1986; therefore, Brown's citation to the 1983 version of section 775.082(1) is in error.  However, the 1985 version and the 1987 version (the year of his penalty phase) were identical to the 1983 version.  We have rejected Brown's challenge to the 1979 version in Mills v. Moore, 786 So. 2d 532 (Fla), cert. denied, 532 U.S. 1015, 121 S. Ct. 1752, 149 L.Ed.2d 673 (2001), and the 1989 version in Mann.  The 1983, 1985, and 1987 versions of section 775.082(1) are identical to the 1979 and 1989 versions of the statute.

Brown v. Moore, 800 So. 2d at 224-25.

The Florida supreme court rejected ground eight:

> We have previously rejected identical arguments. See <u>Mills v.</u>
> <u>Moore</u>, 786 So. 2d 532, 536-38 (Fla.), <u>cert. denied</u>, 532 U.S. 1015, 121
> S. Ct. 1752, 149 L.Ed.2d 673 (2001); <u>Mann</u>, 794 So. 2d at 600. For the
> same reasons explained in those opinions, we reject Brown's
> arguments. Thus, we find that Brown's appellate counsel was not
> ineffective for failing to raise these issues. Accordingly, we deny the
> petition for writ of habeas corpus.

<u>Brown v. Moore</u>, 800 So. 2d at 225.

The Florida supreme court expansively discussed its rejection of <u>Apprendi</u>

claims in <u>Mills v. Moore</u>, 786 So. 2d 532, 536-38 (Fla. 2001), and <u>Mann v. Moore</u>,

794 So. 2d 595, 599 (Fla. 2001), which states:

> Mann's first claim is that the death sentence is unconstitutional
> as applied to him in light of the Supreme Court's decision in <u>Apprendi v.</u>
> <u>New Jersey</u>, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).
> Mann argues that at the time of his penalty phase, the maximum
> sentence under section 775.082, Florida Statutes (1989), was life in
> prison without the possibility for parole for twenty-five years. Mann
> further argues that <u>Apprendi</u> requires aggravators to be charged in the
> indictment and submitted to the jury for its determination beyond a
> reasonable doubt. Mann alleges that his appellate counsel was
> ineffective for failing to raise this issue on direct appeal along with the
> trial court's denial of Mann's request that the jury's recommendation of
> death be unanimous.
>
> This Court recently rejected the argument that <u>Apprendi</u> applied
> to capital sentencing schemes. See <u>Mills v. Moore</u>, 786 So. 2d 532, 26
> Fla. L. Weekly S 242, S243-44 (Fla. Apr. 12, 2001), <u>cert. denied</u>, 149 L.
> Ed. 2d 673, 121 S. Ct. 1752 (2001). In <u>Mills</u>, we also rejected the
> argument that the maximum penalty under section 775.082(1), Florida
> Statutes (1979), was life in prison without the possibility of parole for
> twenty-five years. See 786 So. 2d 532, 26 Fla. L. Weekly at S 244.
> Instead, we wrote that "[t]he plain language of section 775.082(1) is
> clear that the maximum penalty available for a person convicted of a
> capital felony is death." <u>Id.</u> The 1989 version of section 775.082(1)
> argued by Mann is identical to the 1979 version. Thus, Mann's
> <u>Apprendi</u> arguments are without merit.

We also find no merit in Mann's other arguments alleging ineffective assistance of appellate counsel regarding appellate counsel's failure to raise as appellate points the necessity of charging the aggravators in the indictment and the necessity of requiring a unanimous jury recommendation. At the time of his direct appeal, this Court, as we still do today, routinely rejected these arguments. See e.g., Medina v. State, 466 So. 2d 1046, 1048 n.2 (Fla. 1985) (State need not provide notice concerning aggravators); James v. State, 453 So. 2d 786, 792 (Fla. 1984), cert. denied, 469 U.S. 1098, 105 S. Ct. 608, 83 L.Ed.2d 717 (1984) (rejecting argument that jury verdict recommending death must be unanimous). Appellate counsel cannot be ineffective for not raising on appeal an issue with little or no merit. See Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000).

In Apprendi, the United States Supreme Court ruled a jury must find any fact that increases a sentence beyond the statutory maximum. The Court stated that the holding did not affect a capital case. Ring v. Arizona, 536 U.S. 584 (2002), determines that Apprendi applies to Arizona's capital sentencing scheme, which is based on the Arizona Supreme Court's determination that the statutory maximum for a capital offense based on a guilty verdict alone was life. Schriro v. Summerlin, 542 U.S. 348 (2004), determines that Apprendi's rule (requiring a jury to find any fact that increases a sentence beyond the statutory maximum) was a new rule of law not retroactively applicable. Accord Turner v. Crosby, 339 F.3d 1247, 1279-86 (11th Cir. 2003); Johnson v. State, 904 So. 2d 400 (Fla. 2005). Because Brown's conviction became final with the denial of certiorari on November 26, 1990, Apprendi, which was decided in 2000, is inapplicable to his case. See also Varela v. United States, 400 F.3d 864, 868 (11th Cir. 2005) (Apprendi is not retroactive on collateral review).

Ground eight warrants no habeas corpus relief.

<u>Ground Nine</u>

The trial court's instructions regarding the statutory aggravating factors:
cold, calculated and premeditated circumstance was unconstitutionally
vague in violation of the Eighth and Fourteenth Amendments to the
U.S. Constitution.

<u>Brown's Alleged Facts in Support of Ground Nine</u>

Brown's counsel objected to the jury instruction as to the "aggravating

circumstance," prescribed in Section 921.141(5)(i), Florida Statutes, that the offense

was committed in a "cold, calculated, and premeditated" (CCP) manner.  (R 616-17)

In his direct appeal, Brown argued that <u>Maynard v. Cartwright</u>, 486 U.S. 356 (1988)

(finding unconstitutional an Oklahoma instruction on heinous, atrocious, and cruel)

invalidates Florida's jury instruction on the CCP aggravating circumstance.  The

Florida supreme court rejected Brown's constitutional argument on the basis that

<u>Maynard</u> is inapplicable to Florida and to the CCP aggravator.  <u>See</u> <u>Brown v. State</u>,

565 So. 2d 304 (Fla. 1990).  Four years later, the Florida supreme court conceded

in <u>Jackson v. State</u>, 648 So. 2d 85 (1994), that Florida's standard CCP jury

instruction suffered the same constitutional infirmity as the "heinous, atrocious and

cruel" instruction (HAC) found constitutionally infirm in <u>Espinosa v. Florida</u>, 505

U.S.1079 (1992).

Brown claims that his jury failed to receive complete and accurate instructions

defining the aggravating circumstances in a constitutionally narrow fashion.  The

penalty phase instruction states in pertinent part:

The aggravating circumstances that you may consider are limited to
any of the following that are established by the evidence.  The
Defendant has been previously convicted of a felony involving the use

of violence to some person.  The crime of attempted murder of Tammy Bird is a felony involving the use of violence to another person.

The crime for which the Defendant is to be sentenced was committed while he was engaged in the commission of the crime of burglary.

The crime for which the Defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

(Exhibit A-5, R 658-59)

The jury recommended death by a vote of seven to five.  Imposing the death sentence, the trial court found three aggravating circumstances (Exhibit A-8, R 912-16) and insufficient mitigation to outweigh any one of the aggravators. (Exhibit A-8, R 912-16)  Under <u>Espinosa</u>, Brown's capital sentencing was tainted with Eighth Amendment error because the jury improperly considered an invalid aggravating circumstance, "cold, calculated, and premeditated."  (Exhibit A-5, R 658-59)  The standard jury instruction contains none of the Florida supreme court's limiting constructions for this aggravator, and Brown argues that the instruction is vague, overbroad, and without sufficient guidance to the jury in recommending a sentence.

Brown challenged the validity of Section 921.141(5)(i), Florida Statutes, in his direct appeal and raised the issue in his Rule 3.850 post-conviction motion. Rejecting Brown's claim, the Florida supreme court held the vagueness claim procedurally barred absent a specific objection at trial and presentation on direct appeal.  <u>James v. State</u>, 615 So. 2d. 668 (Fla. 1993); <u>Walls v. State</u>, 641 So. 2d 381 (Fla. 1994); <u>Pope v. State</u>, 702 So. 2d 221 (Fla. 1997).  Brown's counsel failed to object at trial.

The record shows that Brown filed several motions to declare provisions of Section 921.141(5)(i), Florida Statutes, unconstitutionally overbroad. On appeal, Brown challenged the vague language of the statute and cited Maynard v. Cartwright, 486 U.S. 356 (1988). Brown sought re-sentencing on this issue after the Florida supreme court acknowledged that Maynard applied, and Brown sought relief pursuant to Espinosa v. Florida, 505 U.S. 1079 (1992). Brown claims that the state courts' denial of relief resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law and resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### Ground Nine Warrants No Habeas Relief

Brown inaccurately asserts that he raised this claim both on direct appeal and in his state post-conviction motion. (Petition, pp. 48-49) Brown urged on direct appeal that the instruction on the CCP aggravating circumstance was unconstitutionally vague because the instruction omitted a limiting construction. However, the Florida supreme court found Maynard v. Cartwright, 486 U.S. 356 (1988), inapposite to Florida's heinous, atrocious, or cruel aggravating factor and found the attempt to "transfer Maynard to this state and to a different aggravating factor misplaced." Brown v. State, 565 So. 2d at 308.

Following the denial of post-conviction relief in the trial court, Brown appealed and argued both that the CCP instruction was unconstitutionally vague and that Espinosa v. Florida, 505 U.S. 1079 (1992), and Hodges v. Florida, 506 U.S. 803 (1992), undermined the previous ruling on the inapplicability of Maynard. The

Florida supreme court found the claim procedurally barred by counsel's failure either

to object at trial to the vagueness of the statute or to request a limiting instruction

(rather than merely objecting on the basis of evidentiary insufficiency).  Brown v.

State, 755 So. 2d at 622-23, states:

> Although Brown does not refer to it in the present appeal,
> Jackson v. State, 648 So. 2d 85 (Fla. 1994), was a decision
> subsequent to Brown in which we discussed Brown and acknowledged
> that this Court's opinion as to the inapplicability of Maynard to CCP
> instructions had been "discredited in Espinosa" and "undercut by
> Hodges."  Jackson, 648 So. 2d at 88.  In Jackson, we held that:
>
>> Florida's standard CCP jury instruction suffers the same
>> constitutional infirmity as the HAC-type instructions which
>> the United States Supreme Court found lacking in
>> Espinosa, Maynard, and [Godfrey v. Georgia, 446 U.S.
>> 420, 428-29, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980)].
>
> 648 So. 2d at 90.  However, we then held:
>
>> Claims that the instruction on the cold, calculated, and
>> premeditated aggravator is unconstitutionally vague are
>> procedurally barred unless a specific objection is made at
>> trial and pursued on appeal.  James v. State, 615 So. 2d
>> 668, 669 & n.3 (Fla. 1993)
>
> 648 So. 2d at 90.  We followed Jackson with Walls v. State, 641 So. 2d
> 381 (Fla. 1994), in which we held in respect to Jackson constitutional
> error as to the CCP instruction:
>
>> To preserve the error for appellate review, it is necessary
>> both to make a specific objection or request an alternative
>> instruction at trial, and to raise the issue on appeal.
>
> Walls, 641 So. 2d at 387.  In Pope v. State, 702 So. 2d 221 (Fla. 1997),
> we again addressed the preservation issue and held:
>
>> However, we have made it clear that claims that the CCP
>> instruction is unconstitutionally vague are procedurally
>> barred unless a specific objection is made at trial and
>> pursued on appeal.  The objection at trial must attack the

instruction itself, either by submitting a limiting instruction
or making an objection to the instruction as worded.

702 So. 2d at 223-24.  Since our decision in Brown's direct appeal on this issue was reached on the basis of our holding that Maynard did not apply, we did not reach the issue of preservation of the claim at trial. We have in this appeal reviewed the trial record to determine whether the issue was preserved by an objection to the instruction as worded or by a request for a limiting instruction.  We find that defense counsel's only objections to the CCP instruction were presented at the jury instruction conference and the allocution hearing:

> I object to that one.  There is no basis in the evidence
> before the Court. It is insufficient evidence to border [sic]
> on the instruction on that.

Later, at the allocution hearing before the court prior to sentencing, defense counsel argued against the application of the CCP aggravator as follows:

> The case law is quite clear that aside from legal
> premeditation, the proof that a capital felony is committed
> in a cold, calculated and premeditated manner without any
> pretense of moral or legal justification requires proof of
> much greater weight than does the mere premeditation
> required to prove a first- degree murder case . . . .  I do not
> believe that the evidence is weighty enough or convincing
> enough to show that this capital felony was committed in a
> cold, calculated and premeditate[d] manner within the
> meaning of the aggravating circumstance in the statute.

Defense counsel neither submitted a limiting instruction nor specifically objected that the CCP instruction was unconstitutionally vague, as we required in Pope.  Accordingly, we find that defense counsel's objection did not preserve this issue for appellate review in accord with Jackson, Walls, and Pope.

Consequently, the state courts properly found the claim in ground nine

procedurally barred.  Brown fails to establish cause and prejudice to excuse the

procedural default as required by Wainwright v. Sykes, 433 U.S. 72 (1997).  In his

reply to the response, Brown fails to rebut the State's contention that ground nine is procedurally barred.

Furthermore, any error related to ground nine is harmless. The Florida supreme court recognizes the applicability of the harmless error doctrine to an improper CCP instruction. See Walls v. State, 641 So. 2d 381 (Fla. 1994) (approving CCP finding for execution-style murder despite vague instruction). Accord Foster v. State, 654 So. 2d 112 (Fla. 1995) (harmlessness exists if the record supports a finding that the murder was, beyond a reasonable doubt, cold, calculated, and premeditated without any pretense of moral or legal justification under any definition of those terms); Henderson v. Singletary, 617 So. 2d 313 (Fla. 1993) (no statutory mitigating factor was established and the non-statutory mitigating factors presented deserved comparatively little weight).

In Brown's case, the trial court judge stated in his sentencing order:

> There was, from the evidence a lengthy, methodic, and involved series of events that showed a substantial period of reflection and thought by the defendant. These include, among others, the defendant's securing bolt cutters, going to the victim's home in the middle of the night, cutting the lock, going back to the car to get the weapon, returning and entering where the victims slept, the defendant's confessed knowledge of what [sic] knew he would have to do, the fact that he armed himself to "talk" to a seventeen year old girl and the shot to the head to "make it quick". The defendant's act was nothing less than an execution.

(Exhibit A, pp. 913-14).

And as the Florida supreme court found on direct appeal:

> The psychologist who testified on Brown's behalf at sentencing admitted that Brown made a statement to him indicating he had considered shooting the victim before going to her residence. The

psychologist conceded that the homicide may well have been preplanned rather than impulsive.  The trial court characterized this killing as "nothing less than an execution."  On the totality of the circumstances, this case demonstrates the heightened premeditation necessary to finding the murder to have been committed in a cold, calculated and premeditated manner.

Brown v. State, 565 So. 2d at 308-09 (citation omitted).

The United States Supreme Court has not found Florida's CCP jury instruction unconstitutional.  Even if that Court finds the instruction invalid, Brown could obtain no relief because of the non-retroactivity principle of Teague v. Lane, 489 U.S. 288 (1989).  See Lambrix v. Singletary, 520 U.S. 518 (1997) (holding Espinosa v. Florida, 505 U.S. 1079 (Fla. 1992), not retroactive regarding the HAC instruction); Glock v. Singletary, 65 F.3d 878 (11th Cir. 1995) (en banc), cert. denied, 519 U.S. 888 (1996).  Furthermore, Brown may not obtain relief in a federal habeas corpus petition for a violation of state law.

Finally, because Brown cannot show that the state court ruling on ground nine is contrary to, or an unreasonable application of, United States Supreme Court precedent, ground nine warrants no habeas relief.

## CONCLUSION

Accordingly, Brown's petition for the writ of habeas corpus (Doc. 59) is **DENIED**.  The Clerk shall enter a judgment against Brown and close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

Brown is not entitled to a certificate of appealability.  Without an absolute entitlement to appeal, a disappointed petitioner for the writ of habeas corpus may acquire a certificate of appealability "only if the applicant has made a substantial

- 75 -

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  A petitioner

"must demonstrate that reasonable jurists would find the district court's assessment

of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274,

282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the

issues presented were 'adequate to deserve encouragement to proceed further, ' "

Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463

U.S. 880, 893 n.4 (1983)).  Because Brown fails the requisite showing, a certificate

of appealability is **DENIED**.

Finally, because Brown is not entitled to a certificate of appealability, he is not

entitled to appeal in forma pauperis, leave for which is **DENIED**.

ORDERED in Tampa, Florida, on November 25, 2009.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE